# 2020-1637

In The

# United States Court Of Appeals For The Federal Circuit

---

## JAMES R. RUDISILL,

*Claimant-Appellee,*

**v.**

## DENIS McDONOUGH, Secretary of Veterans Affairs,

*Respondent-Appellant.*

---

ON APPEAL FROM THE UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS ORIGINATING CASE NO.: 16-4134

---

### EN BANC RESPONSE BRIEF OF CLAIMANT-APPELLEE

---

Timothy L. McHugh
Abbey M. Thornhill
TROUTMAN PEPPER
HAMILTON SANDERS LLP
1001 Haxall Point
15th Floor
Richmond, VA 23219
(804) 697-1365

David J. DePippo
DOMINION ENERGY
SERVICES INC.
Riverside 2
120 Tredegar Street
Richmond, VA 23219
(804) 819-2411

*Counsel for Claimant-Appellee*

**FORM 9. Certificate of Interest**                                      Form 9 (p. 1)
                                                                          July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2020-1637 |
| **Short Case Caption** | Rudisill v. McDonough |
| **Filing Party/Entity** | Appellee |

---

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/13/2022

Signature:  /s/ Timothy L. McHugh

Name:  Timothy L. McHugh

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| James R. Rudisill | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| Abbey Thornhill | | |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# **Table of Contents**

Statement of Related Cases ..................................................... xi

Jurisdictional Statement ........................................................ 1

Statement of the Issues ......................................................... 1

Introduction ......................................................................... 3

Statement of the Case ............................................................ 5

I.   Mr. Rudisill's separately qualifying service .................................... 5

II.  The statutory scheme ......................................................... 8

   a.   The Montgomery GI Bill .................................................. 8

   b.   The Post-9/11 GI Bill .................................................... 10

   c.   Relevant administrative provisions ..................................... 12

      i.    Period of service elections under all programs ...................... 12

      ii.   Benefit-exchange elections under the Post-9/11 program ....... 14

      iii.  48-month aggregate cap ............................................ 16

III.   The Veterans Court's decision ............................................. 17

IV.   This Court's decision and *en banc* order ................................. 21

Summary of the Argument .................................................... 23

Argument ......................................................................... 26

I. Standard of Review .......................................................... 26

II.  This Court lacks jurisdiction because the Solicitor General failed
to timely authorize the Secretary's appeal .................................... 26

   a.   *FEC* establishes the rule regarding retroactive authorizations of
   appeals ..................................................................... 27

   b.   This case is on all fours with *FEC*, which controls here ............ 29

III.   The text, context, legislative history, and pro-veteran canon
establish that veterans who qualify for the Montgomery and Post-9/11
GI Bills under separate periods of qualifying service are entitled to 36
months under each program, subject only to 38 U.S.C. § 3695(a)'s 48-
month cap ...................................................................... 34

a. The text and context of §§ 3322(d) and 3327 within the statutory scheme are consistent with the Veterans Court's interpretation .... 35

    i. Express purpose .................................................................. 36

    ii. Entitlement provisions ........................................................ 37

    iii. Concurrent-receipt bar ....................................................... 39

    iv. Period of service elections ................................................... 41

    v. Benefit-exchange elections .................................................. 46

    vi. 48-month aggregate cap...................................................... 56

b. The legislative history of the statutory scheme further supports the Veterans Court's interpretation ................................................ 58

c. The pro-veteran canon resolves any ambiguity in the statutory scheme in favor of veterans with separate periods of qualifying service ...................................................................................... 63

d. The Secretary's position produces absurd results unfavorable to most veterans ................................................................................ 69

Conclusion ......................................................................................... 71

# Table of Authorities

**Page(s)**

**Cases:**

*Acree v. O'Rourke*,
  891 F.3d 1009 (Fed. Cir. 2018).....................................68-69

*Barrett v. Nicholson*,
  466 F.3d 1038 (Fed. Cir. 2006)............................................ 69

*Brown v. Gardner*,
  513 U.S. 115 (1994) ...............................................20, 25, 63

*Carr v. Wilkie*,
  961 F.3d 1168 (Fed. Cir. 2020)....................................*passim*

*Chevron USA, Inc. v. NRDC*,
  467 U.S. 837 (1984) ............................................................ 64

*Comm'r v. Keystone Consol. Indus., Inc.*,
  508 U.S. 152 (1993) ...............................................39, 40, 55

*DWA Holdings LLC v. United States*,
  889 F.3d 1361 (Fed. Cir. 2018)..............................38, 40, 42

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ...................................................35, 36

*Fed. Elec. Comm'n v. NRA Political Victory Fund*,
  513 U.S. 88 (1994) ....................................................*passim*

*Fed. Energy Admin. v. Algonquin SNG, Inc.*,
  426 U.S. 548 (1976) ............................................................ 61

*Finley v. United States*,
  490 U.S. 545 (1989) ............................................................ 22

*Fla. Dep't of Rev. v. Piccadilly Cafeterias, Inc.*,
  554 U.S. 33 (2008) .............................................................. 36

*Hogg v. United States*,
  428 F.2d 274 (6th Cir. 1970) ..............................30, 32, 33, 34

*In re City of Houston*,
  731 F.3d 1326 (Fed. Cir. 2013).......................................... 35

*Kisor v. McDonough,*
    995 F.3d 1316 (Fed. Cir. 2021)........................................65, 66

*Lynch v. McDonough,*
    21 F.4th 776 (Fed. Cir. 2021) .............................................26

*McGirt v. Oklahoma,*
    140 S. Ct. 2452 (2020) .......................................................64

*Morgan v. Principi,*
    327 F.3d 1357 (Fed. Cir. 2003)...........................................29

*Procopio v. Wilkie,*
    913 F.3d 1371 (Fed. Cir. 2019)...........................................64

*Robinson v. Shell Oil Co.,*
    519 U.S. 337 (1997) ...........................................................36

*Rowland v. Cal. Men's Colony,*
    506 U.S. 194 (1993) ...........................................................36

*United States ex rel. Accardi v. Shaughnessy,*
    347 U.S. 260 (1954) ...............................................32, 33, 34

*United States v. Hill,*
    19 F.3d 984 (5th Cir. 1994) ....................................30, 32, 34

*United States v. Nixon,*
    418 U.S. 683 (1974) ...............................................32, 33, 34

*Vollono v. McDonough,*
    991 F.3d 1381 (Fed. Cir. 2021).......................................39-40

## Statutes &Regulations:

10 U.S.C. § 510(f) .......................................................................46

10 U.S.C. § 1175(e)(3)(B) ...........................................................46

10 U.S.C. § 2146(a) .....................................................................46

10 U.S.C. § 12524(c) ...................................................................46

10 U.S.C. § 16132(d) ...................................................................12

10 U.S.C. § 16163(d) ................................................................. 12, 46

28 U.S.C. § 510 ............................................................................. 31

28 U.S.C. § 518(a) .................................................................. 27, 31

28 U.S.C. § 519 ............................................................................. 31

38 U.S.C. § 1511(c)(1) ................................................................ 46

38 U.S.C. § 1512(a)(3)(A) .......................................................... 46

38 U.S.C. § 1980(f)(1) ................................................................ 46

38 U.S.C. § 3001 ....................................................................... 8, 9

38 U.S.C. § 3011 .......................................................................... 46

38 U.S.C. § 3011(a)(1)(A) ....................................................... 8, 9

38 U.S.C. § 3011(b) ............................................................... 47, 48

38 U.S.C. § 3011(b)(1) ............................................................... 10

38 U.S.C. § 3011(c) .................................................................... 47

38 U.S.C. § 3011(c)(1) ............................................................... 10

38 U.S.C. § 3012(c) .................................................................... 48

38 U.S.C. § 3012(e)(2) ............................................................... 46

38 U.S.C. § 3013(a) ...................................................................... 9

38 U.S.C. § 3013(a)(1) ................................................................. 9

38 U.S.C. § 3031(a) ...................................................................... 8

38 U.S.C. § 3033(a) ....................................................... 13, 40, 58

38 U.S.C. § 3033(a)(1) ............................................................... 40

38 U.S.C. § 3033(c) ............................................................... 12, 43

38 U.S.C. § 3202(1)(D)(i) .......................................................... 46

38 U.S.C. § 3221(f) ..................................................................... 12

38 U.S.C. § 3311 ................................................................... *passim*

38 U.S.C. § 3311(a) .............................................................. 11, 37

38 U.S.C. § 3311(b) ................................................................. 11

38 U.S.C. § 3311(f)(3) ............................................................ 46

38 U.S.C. § 3312 ........................................................... *passim*

38 U.S.C. § 3312(a) ....................................................... *passim*

38 U.S.C. § 3321(a)(2) ............................................................. 8

38 U.S.C. § 3322 ..................................................... 17, 18, 54

38 U.S.C. § 3322(a) ....................................................... *passim*

38 U.S.C. § 3322(b) ............................................................... 19

38 U.S.C. § 3322(c) .................................................. 13, 19, 43

38 U.S.C. § 3322(d) ....................................................... *passim*

38 U.S.C. § 3322(g) ............................................................... 19

38 U.S.C. § 3322(h)(1) ................................................... *passim*

38 U.S.C. § 3327 ........................................................... *passim*

38 U.S.C. § 3327(a) ....................................................... *passim*

38 U.S.C. § 3327(a)(1) .......................................................... 52

38 U.S.C. § 3327(a)(1)(A) ..................................................... 50

38 U.S.C. § 3327(a)(1)(C) ..................................................... 50

38 U.S.C. § 3327(a)(1)(E) ................................................ 48, 50

38 U.S.C. § 3327(a)(2) .......................................................... 50

38 U.S.C. § 3327(b) ...................................................... 16, 48

38 U.S.C. § 3327(c)(3) .......................................................... 16

38 U.S.C. § 3327(d) ...................................................... 50, 52

38 U.S.C. § 3327(d)(1) ................................................... 15, 52

38 U.S.C. § 3327(d)(2) ................................................... *passim*

38 U.S.C. § 3327(d)(2)(A) ..................................................... 52

38 U.S.C. § 3327(g) .............................................................. 16

38 U.S.C. § 3327(i) ............................................................. 46

38 U.S.C. § 3681(b) ............................................................ 40

38 U.S.C. § 3695 ........................................................... *passim*

38 U.S.C. § 3695(a) ....................................................... *passim*

38 U.S.C. § 3695(a)(1) .......................................................... 2

38 U.S.C. § 3695(a)(2) .......................................................... 2

38 U.S.C. § 3695(a)(3) .......................................................... 2

38 U.S.C. § 3695(a)(4) ..................................................... 2, 58

38 U.S.C. § 3695(a)(5) .......................................................... 2

38 U.S.C. § 3695(a)(6) .......................................................... 2

38 U.S.C. § 3695(a)(7) .......................................................... 2

38 U.S.C. § 7292 ......................................................... 29, 34

28 C.F.R. § 0.180 .............................................................. 33

28 C.F.R. § 0.20(a) ............................................................ 28

28 C.F.R. § 0.20(b) ....................................................... *passim*

28 C.F.R. Part 0, Subpart Y App. § 6 ....................................... 30

38 C.F.R. § 21.4022 ..................................................... 40, 41, 43

38 C.F.R. § 21.7042(d)(4) ................................................. 12, 39

38 C.F.R. § 21.7540(c) ........................................................ 12

38 C.F.R. § 21.9520(a) .................................................... 50, 64

38 C.F.R. § 21.9520(b) .................................................... 50, 64

38 C.F.R. § 21.9520(c) ................................................ 16, 50, 64

38 C.F.R. § 21.9550(b)(1) ..................................................... 15

38 C.F.R. § 21.9550(c) ........................................................ 15

38 C.F.R. § 21.9635(w) ............................................. 13, 40, 41, 43

38 C.F.R. § 21.9690 ..................................................... 40, 41, 43

38 C.F.R. § 21.9690(a) ............................................................... 13

74 Fed. Reg. 14,654 (Mar. 31, 2009) ................................. 41, 43

**Other Authorities:**

Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ................................................................. 36

Consumer Fin. Prot. Bureau, Ch. 30 Basic Pay Reduction by Fiscal Year (Sept. 2017) ................................................................. 10

*A Conversation with U.S. Senator Jim Webb*, 35 Fordham Int'l L. Journal (2012) .......................................................................... 61

*Hearing on DOD/VA Collaboration And Cooperation On The Education Needs of Returning Servicemembers: Hearing Before the S. Comm. On Veterans' Affs.*, 110th Cong. (2007) .................. 10, 62

*Hearing on Pending Benefits Legislation: Hearing Before the S. Comm. On Veterans' Affs.*, 110th Cong. (2007) ......................................... 61, 62

Joseph Keillor, Note, *Veterans at the Gates: Exploring the New GI Bill and Its Transformative Possibilities*, 87 Wash. U. L. Rev. 175 (2009) .................................................................................... 66

Pub. L. No. 98-223, § 203(b), 98 Stat. 41 (Mar. 2, 1984) ......................... 40

Pub. L. No. 110-252, Title V, 122 Stat. 2357 (2008) ...................... *passim*

Restatement (Second) of Agency § 90 (1958) .......................................... 28

S. Rep. No. 111-346 (2010), *as reprinted in* 2010 U.S.C.C.A.N. 1503 ................................................................................. 41, 63

S. Rep. No. 90-1394 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 4486 .... 59

Secretary's M22-4 Manual at Pt. 3, § 3.10 ............................................. 15

Secretary's M22-4 Manual at Pt. 4, § 3.02(a) .......................................... 44

Veterans' Readjustment Assistance Act of 1952, Pub. L. No. 82-550, 66 Stat. 663 (1952) .................................................................... 17

## <u>Statement of Related Cases</u>

No appeal from this civil action was previously before this or any other appellate court, other than the Court of Appeals for Veterans Claims from which the decision is being appealed.

Counsel is not aware of any case pending in this or any other court or agency within the meaning of the Rule 47.5 Practice Notes that will directly affect or be directly affected by this Court's decision in the pending appeal.

## Jurisdictional Statement

For the reasons explained in Argument Section II, this Court does not have jurisdiction over this appeal.

## Statement of the Issues

As a threshold issue, the Court lacks jurisdiction due to the Solicitor General's untimely attempted retroactive authorization of the Secretary's appeal. *See* Argument Section II.

On the merits, the Court determined this appeal warrants *en banc* consideration and requested briefing on the following two questions:

1. For a veteran who qualifies for the Montgomery GI Bill and the Post-9/11 GI Bill under a separate period of qualifying service, what is the veteran's statutory entitlement to education benefits?

2. What is the relation between the 48-month entitlement in 38 U.S.C. § 3695(a), and the 36-month entitlement in § 3327(d)(2), as applied to veterans such as Mr. Rudisill with two or more periods of qualifying military service?

The answer to the first question is that a veteran entitled to the Montgomery and Post-9/11 GI Bills based on separate periods of qualifying service is entitled to 36 months of benefits under each

program, subject only to § 3695(a)'s 48-month aggregate cap. *See* Argument Section III. The answer to the second question is demonstrated by the answer to the first; the relationship between § 3695(a) and § 3327(d)(2) is that the former limits the total months of benefits a veteran can receive under all programs listed in § 3695(a)(1)-(7) to 48, regardless of how many periods of qualifying service the veteran has, while the latter limits the months of Post-9/11 benefits a veteran can obtain for any *single period of qualifying service* when a veteran exchanges previously established Montgomery benefits for Post-9/11 benefits.

## **Introduction**

The Court lacks jurisdiction. The Secretary admits the Solicitor General had to approve the appeal, which occurred months after the notice-of-appeal deadline. Under Supreme Court precedent, the Solicitor General's belated approval does not confer jurisdiction.

Should the Court reach the merits, it should affirm. The parties agree the three-time Army veteran here, Mr. Rudisill, separately is entitled to two GI Bill educational benefits—the Montgomery and Post-9/11 GI Bills—due to roughly eight years of qualifying service. Like millions of his brothers and sisters in arms, Mr. Rudisill applied for the more generous Post-9/11 benefits before exhausting his Montgomery benefits. The question at the heart of this case is whether 38 U.S.C. §§ 3322(d) and 3327 are the exclusive means by which a veteran who retains unused Montgomery benefits and has qualifying service not used to establish entitlement to those benefits, like Mr. Rudisill, can establish entitlement to Post-9/11 benefits. They are not.

Sections 3322(d) and 3327 establish a veteran-friendly benefit-exchange election process that allows veterans seeking Post-9/11 benefits *on the basis of otherwise qualifying service previously credited to another*

3

*program* to re-credit that service to the Post-9/11 program, accessing the more generous Post-9/11 benefits Congress provided. Veterans who can establish entitlement to Post-9/11 benefits with qualifying service not previously credited to another program, however, need not make this exchange, consistent with over 70 years of GI Bill practice. Veterans in the latter category can credit unused qualifying service to the Post-9/11 program under §§ 3311-12 and 3322(h)(1) and use both benefits up to a long-existing aggregate cap. Mr. Rudisill pursues this latter path.

In the Secretary's view, §§ 3322(d) and 3327 apply as a string attached to entitlements under multiple programs, forcing veterans to give up benefits to obtain others, or use benefits in some particular order to obtain others. This view finds no support in the law. According to the Secretary, whether they serve eight or 28 years, long-serving post-9/11 veterans with sufficient qualifying service not already credited to the Montgomery program must, for some unexplainable policy or textual reason, either exhaust or exchange their Montgomery benefits before receiving Post-9/11 benefits. As a result, long-serving post-9/11 veterans must either forfeit 12 of the 48 months of total educational benefits that

they have earned through their service or receive only 12 of those 48 months under the Post-9/11 program.

The Secretary reaches his bizarre reading by focusing almost exclusively on §§ 3322(d) and 3327. Even in isolation, these provisions do not support the Secretary's reading. When they are read in context within the statutory scheme, and alongside the Secretary's implementing regulations, the relevant legislative history, and the pro-veteran canon, the result is even clearer:  long-serving veterans like Mr. Rudisill with separately qualifying service are not subject to the Secretary's nonsensical, veteran-unfriendly, relinquish-or-exhaust requirement. That is, §§ 3322(d) and 3327 are not the only path to Post-9/11 benefits for long-serving veterans.

## Statement of the Case

### I.    Mr. Rudisill's separately qualifying service

Mr. Rudisill's adult life has been dedicated to his country, serving roughly eight aggregate years in the military. Appx5. From January 2000 to June 2002, he served as an Army enlisted soldier, before he went to college. Appx4. He returned to the Army while completing his undergraduate degree, after learning close friends were killed in action.

5

Between June 2004 and August 2011, he served over five more years, including two tours in Iraq and one in Afghanistan. Appx4-5, Appx524, Appx537.

During the above service, Mr. Rudisill saw considerable combat and suffered injuries in suicide attacks and roadside bomb explosions. As a platoon leader, he helped save numerous lives by turning back a Taliban assault on his remote outpost, while directing medical evacuations under fire.

Mr. Rudisill was also highly decorated for this military service, being awarded the Bronze Star, Combat Action Badge, Air Assault Badge, Afghanistan and Iraq Campaign Medals with multiple campaign stars, and Kosovo Campaign Medal. He was a Captain before leaving the Army for the FBI, where he has combatted domestic terrorism by white supremacists and ISIS supporters. Appx537.

Recently, Mr. Rudisill re-commissioned as an Ensign in the Navy Reserve.

Based on his service, the parties agree Mr. Rudisill separately is entitled to both Montgomery and Post-9/11 benefits. Sec'y.Br.5. His Montgomery entitlement derives from his 2000 to 2002 service. Appx4.

His Post-9/11 entitlement derives from his service between 2004 and 2011, which he credited to the Post-9/11 program in 2015. Appx5. Mr. Rudisill intended to use approximately ~22 months of his Post-9/11 benefits—the maximum available to him based on his past usage of Montgomery benefits under 38 U.S.C. § 3695(a)'s 48-month aggregate cap—to attend Yale Divinity School and become an Army chaplain. Appx4-5.

The Secretary did not allow this, and instead gave Mr. Rudisill a Hobson's choice. If he wanted Post-9/11 benefits now, he was limited to what he could trade for his remaining Montgomery benefits (~10 months), capping his total benefits under both programs at 36 months. Alternatively, Mr. Rudisill could receive a total of 48 months of benefits, but only if he first exhausted his Montgomery benefits and then applied for 12 months of Post-9/11 benefits. Neither scenario would allow him to obtain the full amount of Post-9/11 benefits available to him under 38 U.S.C. §§ 3312 and 3695(a) or preserve his remaining Montgomery entitlement should he wish to resume using those benefits. The Secretary's mandatory form Mr. Rudisill used to apply for Post-9/11 benefits gave him no other options. Appx583, Appx585.

7

## II.    The statutory scheme

Since 1944, Congress has provided veterans with various levels of educational benefits for their qualifying service. Appx86-91 (explaining all major programs). As time went by and Congress created new programs, it designed each of them to co-exist with established programs. These legislative efforts have developed into a robust scheme for the administration of all veterans' educational benefits.

### a. The Montgomery GI Bill

The Montgomery program, 38 U.S.C. § 3001 *et seq.*, was the sole veterans' educational benefit for active-duty service from 1985 to 2009. In effect today and through at least 2030,[1] it was designed for peacetime service in the years after the Vietnam War. Its purpose is to "assist in the readjustment of members of the Armed Forces to civilian life after their separation from military service," "extend the benefits of a higher

---

[1] Congress's recent imposition of a 2030 end date on Montgomery qualifying service, if not extended or eliminated, means that Montgomery to Post-9/11 benefit-exchange elections will eventually no longer be possible for any veteran. *See* 38 U.S.C. § 3011(a)(1)(A). That would not come to pass until 2060 or later, however, as there will inevitably be those who enter service in 2030, serve 20 or more years, and then have 10 years after retirement to use Montgomery benefits and forever to use Post-9/11 benefits under current law. *See id.* §§ 3031(a), 3321(a)(2).

education to qualifying men and women who might not otherwise be able to afford such an education," "provide for vocational readjustment and to restore lost educational opportunities" resulting from military service, and "promote and assist the All-Volunteer . . . Armed Forces by establishing a new program of educational assistance based upon service . . . to aid in the recruitment and retention of highly qualified personnel." 38 U.S.C. § 3001.

A veteran with three years of qualifying active-duty service after June 30, 1985, or in certain circumstances, like Mr. Rudisill, with two years of qualifying service, who meets certain other criteria, "is entitled" to 36 months of Montgomery benefits. *Id.* §§ 3011(a)(A), 3013(a). This entitlement is subject only "to section 3695," found in Title 38, Chapter 36's administrative provisions applicable to all GI Bill programs. *Id.* § 3013(a)(1); *see Carr v. Wilkie*, 961 F.3d 1168, 1170 (Fed. Cir. 2020).

Unlike the Post-9/11 program, and contrary to the Secretary's arguments, servicemembers are automatically enrolled in the Montgomery program and make 12 monthly monetary contributions to fully establish entitlement to its benefits, unless they affirmatively elect not to participate, a choice made at the time of enlistment. *Id.*

§§ 3011(b)(1), 3011(c)(1) (an individual opting out "is not entitled to" Montgomery benefits). The vast majority of veterans do not opt out of the Montgomery program. *Hearing on DOD/VA Collaboration And Cooperation On The Education Needs of Returning Servicemembers: Hearing Before the S. Comm. On Veterans' Affs.*, 110th Cong. at App.97 (2007) (statement of Sen. Larry Craig) (as of 2007, "[a]t least *95 percent* of servicemembers enroll in [the Montgomery] program");[2] Consumer Fin. Prot. Bureau, Ch. 30 Basic Pay Reduction by Fiscal Year (Sept. 2017) (70-87% enrollment, 2015-2017).[3] As a result, millions of veterans from 1985 to present and moving forward automatically have their first two or three years of qualifying service credited towards establishing Montgomery entitlement.

### b. The Post-9/11 GI Bill

Following the terrorist attacks on September 11, 2001, the Nation set out to fight an open-ended Global War on Terror. While generous and popular during peacetime, the Montgomery program was never designed to incentivize enlistment or account for the sacrifices borne during

---

[2] https://perma.cc/FNC9-M4KC

[3] https://perma.cc/MSM4-QEWH.

wartime. Congress therefore enacted the Post-9/11 GI Bill. Pub. L. No. 110-252, Title V, 122 Stat. 2357 (2008).

The Post-9/11 program recognizes that, among other things: "[s]ervice on active duty in the Armed Forces has been especially arduous . . . since September 11, 2001"; the Montgomery program "is outmoded and designed for peacetime service in the Armed Forces"; "[t]he people of the United States greatly value military service and recognize the difficult challenges involved in readjusting to civilian life after wartime service in the Armed Forces"; and, "[i]t is in the national interest for the United States to provide veterans who serve on active duty in the Armed Forces after September 11, 2001, with enhanced educational assistance benefits that are worthy of such service." *Id.* Title V, § 5002.

A veteran with three years of qualifying service after September 11, 2001 "is entitled" to 36 months of Post-9/11 benefits at the maximum level. 38 U.S.C. §§ 3311(a)-(b), 3312(a). This entitlement, like Montgomery benefits, expressly is made subject only "to section 3695." *Id.* § 3312(a); *Carr*, 961 F.3d at 1170. Unlike Montgomery, there is no mechanism requiring veterans to elect out of the Post-9/11 program at the point of enlistment.

### c. Relevant administrative provisions

### i. Period of service elections under all programs

To prevent windfalls occasioned by GI Bill programs' overlapping qualifying service criteria, Congress has long barred entitlement to multiple benefits based on any single period of qualifying service. Since 1976, when the first active-duty and reserve GI Bill programs with overlapping qualifying service criteria were enacted, every GI Bill program has required veterans to credit each period of qualifying service to only a single program. 38 U.S.C. §§ 3033(c) (Montgomery, Active Duty); 3221(f) (Post-Vietnam); 10 U.S.C. §§ 16132(d) (Montgomery, Selected Reserve); 16163(d) (Reserve Educational Assistance Program).

For decades, these period-of-service election provisions have been understood to mean benefits under different programs may be used "alternately or consecutively . . . to the extent that the [entitlement to] educational assistance is based on service not irrevocably credited to" entitlement to educational assistance under another program. 38 C.F.R. §§ 21.7042(d)(4) (Montgomery, Active Duty), 21.7540(c) (Montgomery, Selected Reserve); *see Carr*, 961 F.3d at 1170 (separately qualifying service earned benefits under both the Vietnam-era and Post-9/11 GI Bills). These settled rules for all programs flow from reading GI Bill

period-of-service election provisions together within the broader statutory scheme, including each programs' standard bar on "concurrent" receipt of separately established entitlements, which implicitly permit alternating or consecutive usage of such benefits. *E.g.*, 38 U.S.C. § 3033(a).

The Post-9/11 GI Bill follows suit: "An individual with qualifying service . . . that establishes eligibility . . . for educational assistance under this chapter" and others "shall elect . . . under which authority such service is to be credited." *Id.* § 3322(h)(1). Relatedly, it prohibits only the "concurrent" receipt of separately established entitlements. *Id.* § 3322(a). Likewise, the Post-9/11 program's implementing regulations allow veterans "in receipt of educational assistance under" the Post-9/11 program who remain "eligible for" benefits under another program to "choose to" alternate back to receiving benefits under the other program at certain intervals. 38 C.F.R. § 21.9635(w); *see also id.* §§ 21.4022, 21.9690(a).[4] If the veteran only has sufficient service to establish

---

[4] The regulations were promulgated shortly after § 3322(a) and (c)'s enactment. Section 3322(h)(1) was added to the statutory scheme soon thereafter, when Congress identified problems with the Post-9/11 program's implementation.

entitlement to a single benefit, she must choose which program to assign such service.[5]

### ii. Benefit-exchange elections under the Post-9/11 program

Unique to the Post-9/11 program—and at the crux of this appeal—are benefit-exchange elections. The Post-9/11 program, effective August 1, 2009, was applicable retroactively to service occurring on or after September 11, 2001 and offered dramatically increased benefits for educational pursuits at traditional institutions of higher learning over existing programs available to veterans, like Montgomery, in recognition of arduous wartime service. Congress sought to give otherwise eligible post-9/11 veterans the ability to coordinate (trade or exchange) their vested entitlement to benefits under other programs, established based on prior period-of-service elections, into entitlement to Post-9/11 benefits.

Congress's scheme for these benefit-exchange elections is located in the Post-9/11 GI Bill's "Administrative Provisions," under the section

---

[5] Of course, because the Montgomery program auto-enrolls servicemembers unless they affirmatively opt-out, an individual with only three years of service that did not opt out would have already credited such service to the Montgomery program.

heading "Bar to duplication of educational assistance benefits" and the sub-heading "Additional coordination matters." Specifically, 38 U.S.C. § 3322(d) authorizes the "coordination" of entitlement to Post-9/11 benefits "on the one hand" with entitlement to other GI Bill benefits "on the other."

The benefit-exchange or "coordination" authorized by § 3322(d) proceeds under "the provisions of section 5003(c) of the Post-9/11 Veterans Educational Assistance Act of 2008," a note to Public Law 110-252 that Congress did not see fit to include in the U.S. Code until it made certain improvements irrelevant here in 2016. Found today in 38 U.S.C. § 3327, the benefit-exchange provisions establish voluntary procedures by which an individual "may elect" to receive Post-9/11 benefits "instead of" benefits under programs like the Montgomery GI Bill, if they otherwise meet the Post-9/11 program's qualifying service criteria. 38 U.S.C. § 3327(a), (d)(1); 38 C.F.R. § 21.9550(c), 21.9550(b)(1).

These benefit-exchange elections are necessary only when an individual must "forfeit one benefit in order to qualify for" Post-9/11 benefits because of a prior period-of-service election. Secretary's M22-4 Manual at Pt.3, § 3.10 (distinguishing the "two separate and distinct

types of elections," "period of service" and "in lieu of");[6] *see* 38 C.F.R. § 21.9520(c) (setting forth three separate methods of establishing Post-9/11 entitlement, the first two being period-of-service elections and the third an "in lieu of" election). For those who so-need to make a benefit-exchange election to qualify for Post-9/11 benefits, § 3327 resolves complexities of the exchange. It establishes authority for halting and/or refunding monetary contributions to the Montgomery program, ensures incentives offered previously remain available, and allows benefits previously transferred to family members to remain available to them, among other things. 38 U.S.C. § 3327(b), (c)(3), (g).

### iii.  48-month aggregate cap

Congress has long imposed an aggregate cap on the receipt or usage of benefits independently established through separately qualifying periods of service. Individual GI Bill programs typically provide 36 months of benefits. *See supra*. Thus, sufficient separately qualifying service could, on its face, establish entitlement to aggregate benefits under two or more programs of 72+ months.

---

[6] https://perma.cc/XUY8-JZSN?type=image

Since 1952, however, Congress has imposed an aggregate cap on multiple entitlements, *see* Veterans' Readjustment Assistance Act of 1952 ("Korean War GI Bill"), Pub. L. No. 82-550, 66 Stat. 663 (1952), subject to certain exceptions not relevant here. This aggregate cap today is 48 months. 38 U.S.C. § 3695(a).

## III.   The Veterans Court's decision

In a split decision, a panel of the Veterans Court determined that the Post-9/11 and Montgomery programs "co-exist in a broader statutory scheme . . . as separate programs" that may be used up to the 48-month cap. Appx11. It concluded that Mr. Rudisill's reading implements the scheme as Congress intended, consistent with the Secretary's regulations, and repudiated the Secretary's interpretation as "odd," "absurd," and not "persuasive." Appx18, Appx23, Appx27n.13.

The Veterans Court's "global interpretation of section 3322" harmonizes it with the rest of the program. Appx15-21. Importantly, it interpreted § 3322(d) as requiring a benefit-exchange election under § 3327 only when Post-9/11 entitlement cannot be established by separately qualifying service, and instead is based on service already credited towards entitlement to another benefit. *See* Appx25.

17

The Veterans Court reviewed Congressional intent through § 3322's multiple provisions. Section 3322's heading, "Bar to duplication of educational assistance benefits," indicated Congress was concerned with "'duplication' or double-dipping" of benefits based on a single period of service; "if there's no 'duplication,' there's no cause for concern." Appx16. As § 3322(a) directs, the court looked to the Secretary's implementing regulations, which allow those with separately established entitlements to "switch freely between programs." Appx23, Appx26. This demonstrates that separately established entitlements are anticipated and allowable under the Post-9/11 program.

Regarding § 3322(d), the court found the title, "Additional coordination matters," indicated the subsection "works secondary to other provisions." Appx25. It brings them "into a common whole, to harmonize" them, not to create with its reference to § 3327 "strings attached to educational assistance received under more than one program." *Id*. The Veterans Court declined to "assume a meaning in subsection (d)'s silence that automatically disadvantages veterans" when applied. Appx21. Subsection (d) applies only to qualifying service "already positioned to use [other] benefits," when an individual "want[s]

a second election" to convert their prior election. Appx25. With coordination not required for Mr. Rudisill, a trade under § 3327 was not triggered by § 3322(d), despite the Secretary's insistence on forcing Mr. Rudisill through those procedures. Appx12-13, Appx25, Appx29n.17.

The Veterans Court found additional support for its reading in § 3322(g), which bars a dependent's concurrent receipt of transferred education benefits from more than one individual (*e.g.*, two veteran-parents). Like § 3322(a), § 3322(g) requires an election "under which source to utilize such assistance at any one time." The Veterans Court reasoned that if Congress permits a "person who didn't personally serve in the military to receive up to 48 months of transferred benefits," subject only to a concurrent receipt bar, it would not silently prevent a servicemember "from receiving extra benefits based on multiple, separately qualifying periods of service." Appx18; *see also* Appx19 (similar rationale under § 3322(b)-(c)).

The court also found its reading harmonious with § 3322(h)(1), which bars duplication of eligibility based on any single period of qualifying service. Section 3322(h)(1) mandates "an initial choice among

programs for those who haven't yet tried to use educational assistance attributable to" any given period of qualifying service. Appx25.

The Veterans Court determined the Secretary's position "would render his own regulations inoperable surplusage, something we can't condone." Appx25-26 (regulations reflect "a reality . . . impossible in the Secretary's world").

The court found support for its interpretation of the statutory scheme in Congress's inclusion of all GI Bill programs within § 3695(a)'s 48-month cap. Appx27-28. It refused to read §§ 3322(d) and 3327 as mandating a benefit-exchange election under all factual scenarios. Otherwise, most with separately qualifying service would never realize the 48-month cap, rendering it "largely a nullity . . . something to be avoided." Appx27. Given the history of allowing consecutive usage of separately established entitlements, the Veterans Court refused to presume Congress changed its historical approach, "especially when the change would not be a veteran-friendly one" or promote the broader purpose of the GI Bill. Appx28-29.

Finally, the Veterans Court determined that "to the extent a question remained, if *Brown v. Gardner*, 513 U.S. 115 [(1994)], would

ever have a real effect on an outcome, it would be here." Appx29. "Here, that [pro-veteran] doctrine counsels in favor of an interpretation of the statutory scheme to allow veterans with multiple periods of service to obtain benefits under both the [Montgomery] and the Post-9/11 GI Bill subject to the aggregate cap of 48 months." *Id.*

## IV.   This Court's decision and *en banc* order

A panel of this Court affirmed the Veterans Court, finding that "[t]he statutory pattern does not support the interpretation urged by the Secretary whereby veterans with multiple periods of qualifying service would be limited to the cap applicable to the initial period." Slip.Op.15. The Court affirmed the Veterans Court's holding that "section 3327 does not apply . . . in cases of individuals with dual entitlement based on multiple periods of service, but rather, applies only in cases of individuals with dual entitlement based on a single period of service." Slip.Op.10; *id.* at 4 (Mr. Rudisill is entitled to benefits for each period of separately qualifying service, subject to the 48-month cap).

The Court identified three key Post-9/11 program "provisions relevant to multiple periods of service." *Id.* at 5-7. First, § 3322(h)(1) allows eligible veterans with "multiple periods of service" to elect Post-

9/11 benefits. *Id.* at 7. Second, § 3327 "authorizes veterans who were using previously available GI Bill benefits to switch to the more inclusive Post-9/11 benefits for 'the number of months of unused entitlement.'" *Id.* at 8 (quoting § 3327(d)(2)). Third, § 3312(a) "continue[s] to recite . . . the aggregate period of 48 months of assistance for veterans with more than one period of qualifying service under § 3695." *Id.*

The Court held that the Veterans Court's interpretation "was in conformity with law." *Id.* at 4. The statutory scheme "explicitly provides additional benefits to veterans with multiple periods of qualifying service, whereby each period of service qualifies for education benefits." *Id.* at 15. It "does not support the interpretation urged by the Secretary," the Court explained, noting that Congress made the Post-9/11 program subject to § 3695's 48-month cap, just as it had done "in each GI Bill since at least 1968." *Id.* (citing *Finley v. United States*, 490 U.S. 545, 554 (1989) ("it will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed.")).

The *en banc* Court "decided that the appeal warrants en banc consideration," vacated the panel decision, and reinstated the Secretary's appeal. Reh'g.Ord.2.

## Summary of the Argument

This Court lacks jurisdiction. The Secretary admits he was required to obtain the Solicitor General's authorization of this appeal and did not receive it timely. This untimely authorization fails to confer jurisdiction. *Fed. Elec. Comm'n v. NRA Political Victory Fund* ("*FEC*"), 513 U.S. 88 (1994). Permitting the Solicitor General to retroactively authorize appeals months late would unlawfully grant her unilateral authority to extend jurisdictional deadlines.

On the merits, the Veterans Court was right to conclude §§ 3322(d) and 3327 are not intended for veterans with "more than one period of separately qualifying service." The text, context, legislative history, and pro-veteran canon all support the Veterans Court's reading of these benefit-exchange election provisions and undermine the Secretary's.

The express purpose of the Post-9/11 program is to provide "enhanced" benefits for "arduous" wartime service. The program's entitlement provisions expressly are subject only to § 3695(a)'s 48-month

cap, and not the two provisions upon which the Secretary hangs his case (§§ 3322(d) and 3327). This is just like every other GI Bill program.

Benefit-exchange elections under §§ 3322(d) and 3327 are aimed at veterans wishing to trade previously obtained benefits (e.g., Montgomery benefits) for Post-9/11 benefits. The point of the provisions is to give veterans a second chance to credit otherwise qualifying service, to avoid unjustly denying countless veterans with limited qualifying service maximum opportunity to participate in the Post-9/11 program. Sections 3322(d) and 3327 make no mention of veterans that have other qualifying service and do not need to make a benefit-exchange to obtain Post-9/11 benefits—they can proceed under §§ 3311-3312. This is because the benefit-exchange election is not the only way in which veterans with remaining Montgomery entitlement and multiple periods of qualifying service can obtain Post-9/11 benefits. The Secretary has erred in forcing all such veterans through §§ 3322(d) and 3327's procedures.

The legislative history further supports the Veterans Court's interpretation and undermines the Secretary's. In hearings in 2007 and 2008 before enactment of the Post-9/11 GI Bill, the author of the statute, Senator Jim Webb, and VA officials recognized that veterans could

24

through their service earn benefits under multiple programs, the Post-9/11 program was about "equity for service," and gave no indication that anything about the Post-9/11 program represented a fundamental shift in Congressional GI Bill practice as might justify the Secretary's interpretation.

Finally, under the pro-veteran canon of construction, any interpretive doubt about the role of benefit-exchange elections in light of the broader statutory scheme is resolved in veterans' favor. *Gardner*, 513 U.S. at 118. While the Secretary presents a dueling interpretation of § 3327, it cannot overcome the reasonable interpretation of the statutory scheme advanced by the panel majority, the Veterans Court, and Mr. Rudisill. There is no indication that Congress remotely believed it was doing what the Secretary argues when it created the Post-9/11 GI Bill; indeed, the contrary is true. And there is no rational explanation for *why* Congress would create the blatantly veteran-unfriendly, inequitable system that the Secretary argues for.

## Argument

### I.    Standard of Review

Mr. Rudisill agrees the Court reviews statutory interpretations *de novo*. Sec'y.Br.19. And "except to the extent that an appeal presents a constitutional issue," the Court does not review factual determinations or the application of law to a particular set of facts. *Lynch v. McDonough*, 21 F.4th 776, 779 (Fed. Cir. 2021) (*en banc*).

### II.    This Court lacks jurisdiction because the Solicitor General failed to timely authorize the Secretary's appeal

This Court lacks jurisdiction because the Government's appeal was not properly authorized by the Solicitor General before the jurisdictional deadline. The Solicitor General's authorization came 79 days after the notice-of-appeal deadline. This untimely "effort of the Solicitor General to authorize" the appeal "after the time for filing it had expired did not breathe life into it." *FEC*, 513 U.S. at 88. Because the Solicitor General lacks the "unilateral power to extend" statutory jurisdictional deadlines, this appeal must be dismissed. *Id.* at 99.

### a. *FEC* establishes the rule regarding retroactive authorizations of appeals

*FEC* held that when the Solicitor General is required to authorize a petition for a writ of certiorari on behalf of the Government, she must do so within the statutorily defined deadline. *Id.* at 98. As discussed below, that rule applies to when the United States takes an appeal to this Court.

In *FEC*, the FEC filed a petition for writ of certiorari within the "mandatory and jurisdictional" 90-day deadline. *Id.* at 90 Because "the FEC lacks statutory authority to represent itself . . . before [the Supreme] Court," however, it could not "independently file a petition for certiorari" without "the Solicitor General's authorization." *Id.* at 91. The Solicitor General's authorization came well after the 90-day deadline. *Id.* The question for the Supreme Court was whether the Solicitor General's late authorization of the petition "relate[d] back to the date of the FEC's unauthorized filing so as to make it timely." *Id.* The Court concluded it did not and dismissed the petition for lack of jurisdiction. *Id.* at 98.

*FEC* turned, in part, on 28 U.S.C. § 518(a) and its implementing regulations. The statute provides that "[e]xcept when the Attorney General in a particular case direct otherwise, the Attorney General and

27

the Solicitor General shall conduct and argue suits and appeals in the Supreme Court . . . or in the United States Court of Appeals for the Federal Circuit . . . in which the United States is interested." Then, "[b]y regulation, the Attorney General has delegated [his] authority to the Solicitor General." *FEC*, 513 U.S. at 92. The Solicitor General is responsible for "[c]onducting, or assigning and supervising, all Supreme Court cases, including appeals, petitions for and in opposition to certiorari, briefs and arguments, and . . . settlement thereof." 28 C.F.R. § 0.20(a).

*FEC* turned also on basic principles of agency law, which the Court reasoned have long dictated "'[i]f an act to be effective in creating a right against another or to deprive him of a right must be performed before a specific time, an affirmance is not effective against the other unless made before such time.'" *FEC*, 513 U.S. at 98 (quoting Restatement (Second) of Agency § 90) (1958)). Because an appeal would "creat[e] a right against another" or "deprive him of a right," "'[t]he bringing of . . . an appeal, by a purported agent can not be ratified after the . . . right to appeal has been terminated by lapse of time.'" *Id.* (quoting Restatement § 90, Comment *a*).

28

The *FEC* Court concluded the Solicitor General must possess the authority to file a petition for writ of certiorari "'*at the time ratification [is] made*'" for a previously unauthorized petition to confer jurisdiction in the Supreme Court. *Id.* at 98 (citations omitted). Because the Solicitor General did not possess that authority at the time the FEC's petition was ratified, the Court dismissed the petition. *Id.*

### b. This case is on all fours with *FEC*, which controls here

It is undisputed that the Solicitor General's authorization of this appeal came 79 days *after* the applicable 60-day "mandatory and jurisdictional" deadline, *FEC*, 513 U.S. at 90, under 38 U.S.C. § 7292. *Morgan v. Principi*, 327 F.3d 1357, 1359 (Fed. Cir. 2003); Slip Op. at 11-12 (panel discussing timeline); Sec'y.Br.4. It also is undisputed that the Solicitor General must authorize an appeal to this Court. 28 C.F.R. § 0.20(b). This untimely attempt to breathe life into the Secretary's appeal fails because, just as in *FEC*, at the time of authorization the Solicitor General had no authority to file this appeal herself. *FEC* plainly applies and, as a result, this Court lacks jurisdiction.

The Secretary attempts to avoid the straightforward application of *FEC* in two ways, arguing that the notice of appeal was filed under the

plenary authority of the Attorney General[7] to conduct litigation on behalf of the United States, citing to (i) a DOJ "Directive" that purportedly requires the filing of "protective" notices of appeal when the Solicitor General has not yet authorized the taking of an appeal, and (ii) two out of circuit, pre-*FEC* cases, *Hogg v. United States*, 428 F.2d 274 (6th Cir. 1970), and *United States v. Hill*, 19 F.3d 984 (5th Cir. 1994). Sec'y.Br.4. These arguments do not pass muster.

The Directive simply does not apply in this case. By its terms, the Directive authorizes protective appeals only from "final judicial decisions adverse to the Government . . . involving any direct reference or delegated case" and in bankruptcy decisions by a district court or bankruptcy appellate panel. 28 C.F.R. Part 0, Subpart Y App. § 6. Direct reference and delegated cases are those included as a list of thirteen case types that are initially referred or delegated to United States Attorneys for handling. *Id*. § 4(a)(1)-(13). This case is not among the types listed and was never referred to a U.S. Attorney; it is a veterans' benefits appeal

---

[7] The Secretary has at all times relevant here been represented by the Attorney General through various subordinates within the Civil Division.

that was handled by the Secretary's Office of General Counsel before the Veterans Court. Appx1. This case also is not a bankruptcy case.

More fundamentally, the Assistant Attorney General of the Civil Division cannot delegate appellate authority he does not have. Congress directed the Attorney General and Solicitor General to "conduct and argue suits and appeals" in this Court, "[e]xcept when the Attorney General in a particular case directs otherwise." 28 U.S.C. § 518(a). The Attorney General did not direct otherwise in this case, and the Secretary has not suggested he has. Congress granted the Attorney General broad authority to delegate his own powers, including those under 28 U.S.C. § 518(a). *See id.* §§ 510, 519. The Attorney General used that authority to delegate his § 518(a) authority to "[d]etermin[e] whether, and to what extent, appeals will be taken by the Government to" this Court exclusively to the Solicitor General. 28 C.F.R. § 0.20(b). Nowhere was any such power delegated to the Assistant Attorney General. Certainly, the Assistant Attorney General cannot create it by himself. Without such authority, he cannot purport to delegate and manage it by directive to others within the DOJ.

The Attorney General could decide to amend his delegation, allowing Civil Division attorneys to take "protective" notices of appeal in certain circumstances. The Attorney General has not done so. Congress granted the *Attorney General* power to delegate his authority—not the Assistant Attorney General for the Civil Division. As a result, "[s]o long as" 28 C.F.R. § 0.20(b) "is extant it has the force of law," *United States v. Nixon*, 418 U.S. 683, 695 (1974) (citing *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 267 (1954)), and the Civil Division cannot itself invoke this Court's jurisdiction. This is true "even though the original authority was [the Attorney General's] and he could assert it by amending the regulations." *Accardi*, 347 U.S. at 267. Furthermore, this Court, as part of "the sovereign composed of the three branches[,] is bound to respect and to enforce" the extant regulations against the Secretary and DOJ. *Nixon*, 418 U.S. at 696.[8]

The Secretary's reliance on *Hogg* and *Hill* (which relies uncritically on *Hogg*) also is unavailing. Not only are these out-of-circuit, pre-*FEC*

---

[8] It appears that DOJ regularly takes protective appeals without the Solicitor General's approval, Sec'y.Br.4-5, which fact is rarely known by litigants or courts. A practice's illegality, however, is not inoculated by regularity.

decisions not binding on this Court, they are inconsistent with *FEC*, *Nixon*, and *Accardi*, and thus bad law. *Hogg*'s conclusion that the regulation defining the jurisdiction of the Solicitor General did not foreclose the Attorney General from directing that a notice of appeal be filed, 428 F.2d at 278, is contrary to (1) the Supreme Court's directive that "so long as the Attorney General's regulations remain[ ] operative, he deni[es] himself the authority to exercise the discretion" delegated to another officer, *Nixon*, 418 U.S. at 696, and (2) *FEC*'s unequivocal holding regarding Solicitor General authorizations.

Moreover, *Hogg* is distinguishable. In *Hogg*, the Tax Division filed a notice of appeal pursuant to an order promulgated by the Attorney General himself under 28 C.F.R. § 0.180, not a subordinate. 428 F.2d at 279 (citing order). Here, no such order exists. *Hogg* also reasoned that 28 C.F.R. § 0.20(b) did not "specify when the Solicitor General must render a decision with respect to prosecuting an appeal," *id.* at 280, whereas today the regulation more specifically delegates to the Solicitor General, and only the Solicitor General, the authority to determine "*whether* . . . appeals will be taken" to this Court at all, 28 C.F.R. § 0.20(b) (emphasis added).

33

In light of the foregoing, neither *Hogg* nor *Hill* create an exception to *FEC*, *Nixon*, or *Accardi*.

\*   \*   \*

In sum, *FEC*, *Nixon*, *Accardi*, and § 0.20(b) require that the Solicitor General "determin[e] whether, and to what extent, appeals will be taken by the Government to" this Court. That did not occur here within the deadline for invoking this Court's jurisdiction under 38 U.S.C. § 7292. The Secretary's appeal *must* be dismissed.

## III. The text, context, legislative history, and pro-veteran canon establish that veterans who qualify for the Montgomery and Post-9/11 GI Bills under separate periods of qualifying service are entitled to 36 months under each program, subject only to 38 U.S.C. § 3695(a)'s 48-month cap

The fundamental question on the merits is whether going through 38 U.S.C. §§ 3322(d)'s and 3327's benefit-exchange election provisions is the only way for Mr. Rudisill to establish entitlement to Post-9/11 benefits. The Secretary says yes, *see* Sec'y.Br.20, but the Secretary is wrong. A proper statutory analysis leads to the conclusion that benefit-exchange elections under §§ 3322(d) and 3327 are not required for Mr. Rudisill to establish entitlement to Post-9/11 benefits, because he has "more than one period of separately qualifying service," which allows him

to establish entitlement under §§ 3311-3312. Appx2. The Veterans Court's interpretation, unlike the Secretary's, is consistent with the text, context, and legislative history of the statutory scheme, not to mention all of the Secretary's own implementing regulations. It also harmonizes the statutory scheme in an equitable way, beneficial to all veterans, that complies with the pro-veteran canon of construction.

### a. The text and context of §§ 3322(d) and 3327 within the statutory scheme are consistent with the Veterans Court's interpretation

Statutory interpretation begins with the text. To ascertain plain meaning, the Court "explore[s] the statutory context of an enactment and its amendments over time, as well as other contemporary statutory provisions that are relevant to the context of the provision under review." *In re City of Houston*, 731 F.3d 1326, 1332 (Fed. Cir. 2013) (citations omitted). Indeed, "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). This rule is mandatory: "A court must . . . interpret the statute as a symmetrical and

coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole." *Id.*

Thus, "[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (citations omitted). Statutory context includes "the text of the Act of Congress surrounding the [provisions] at issue, or the texts of other related congressional Acts," *Rowland v. Cal. Men's Colony*, 506 U.S. 194, 199 (1993), the location of the provisions within the larger statutory scheme, *see Fla. Dep't of Rev. v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008), and "the purpose of the text" as "derived from the text" itself, Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* ("Reading Law") 56 (2012).

### i. Express purpose

The meaning of §§ 3322(d) and 3327 can only be understood from the broader statutory scheme, read in context and as a harmonious whole. The purpose of the Post-9/11 GI Bill is to recognize: that military service has been "especially arduous . . . since September 11, 2001"; the

36

Montgomery program "is outmoded and designed for peacetime service" prior to September 11, 2001; "the difficult challenges involved in readjusting to civilian life after wartime service"; and, "to provide veterans who serve on active duty in the Armed Forces after September 11, 2001, with enhanced educational assistance benefits that are worthy of such service . . . ." Title V, § 5002, 122 Stat. 2357. The text of the statute itself reflects "clear" congressional intent to provide "enhanced" benefits for wartime service that Congress expressly distinguished from the existing Montgomery program, the latter of which it simultaneously left in place and amended in numerous ways to "co-exist in a broader statutory scheme" with the new Post-9/11 program. Appx11-12.

### ii. Entitlement provisions

The heart of the Post-9/11 program is in its entitlement provisions. Under the heading "Entitlement," 38 U.S.C. § 3311(a) provides that any veteran with sufficient qualifying service "is entitled" to Post-9/11 benefits. Then, under the heading "In general," § 3312(a) provides that statutory entitlement is, as relevant here, subject only "to section 3695." This "statement of benefits *entitlement*," uniform across all GI Bill programs, *Carr*, 961 F.3d at 1176 (collecting statutes), does *not* provide

that entitlement is subject to or conditioned upon anything in §§ 3322(d) or 3327. In fact, there is no reference to those statutes in §§ 3311 and 3312.

The entitlement statute's reference to § 3695, which contemplates combined usage of Montgomery and Post-9/11 benefits up to an aggregate of 48 months, was one indicator to the Veterans Court that Congress intended the programs to "co-exist in a broader statutory scheme" that contemplated usage of separately established benefits up to the 48-month cap. Appx11 (citing § 3312(a)). These points also are strong evidence under the negative-implication canon that, in general, Congress did not intend entitlement to Post-9/11 benefits to be limited by any of the other provisions of the Post-9/11 program that it created simultaneously with §§ 3311 and 3312. *DWA Holdings LLC v. United States*, 889 F.3d 1361, 1371 (Fed. Cir. 2018).

Further confirming the soundness of the foregoing, the Post-9/11 program's entitlement provisions are mirror-images of prior program's entitlement provisions, *Carr*, 961 F.3d at 1176 (collecting statutes), which for decades have been understood to permit separately established entitlements subject only to an aggregate cap, *see, e.g.*, *id.* at 1170

(separately qualifying service earned benefits under both the Vietnam-era and Post-9/11 GI Bills); 38 C.F.R. § 21.7042(d)(4) (Montgomery, Active Duty). Congress's use of the same terms in the Post-9/11 program strongly suggests it intended the same result, particularly considering the overlapping, interrelated nature of the GI Bill framework, which should be given "'as great an internal symmetry and consistency as its words permit.'" *Comm'r v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 159 (1993) (citations omitted).

### iii. Concurrent-receipt bar

Additional provisions relevant to understanding §§ 3322(d) and 3327's meaning are found in Subchapter III of Chapter 33, titled "Administrative Provisions." The first of these is the concurrent-receipt bar found in § 3322(a).[9] This provision bars only the "concurrent"—meaning "[o]perating at the same time; covering the same matters"—receipt of benefits under the Montgomery and Post-9/11 programs, among others, during the same school period. *Vollono v. McDonough*, 991

---

[9] The Secretary does not address § 3322(a), contending that neither this Court nor Mr. Rudisill addressed the provision in *en banc*-related filings. Sec'y.Br.33n.8. In any event, this provision was considered by the Veterans Court and is relevant to understanding of the statutory scheme.

F.3d 1381, 1384 (Fed. Cir. 2021) (applying dictionary definition to mirror-image § 3033(a) and citing implementing regulation); Appx17 (same regarding § 3322(a) and 38 C.F.R. §§ 21.4022, 21.9690, 21.9635(w)). By negative implication, § 3322(a) must, therefore, permit consecutive receipt of separately established benefits under the Montgomery and Post-9/11 programs. Further, the ability to receive consecutive, separately established benefits always has been permitted under the mirror-image provisions of other GI Bill programs,[10] and the overall veterans' benefits statutory scheme should be given "'as great an internal symmetry and consistency as [their] words permit.'" *DWA Holdings*, 889 F.3d at 1371; 38 U.S.C. § 3033(a)(1); *Keystone Consol.*, 508 U.S. at 159.

Section 3322(a) also charges the Secretary to develop a regulatory method of electing between benefit programs thereunder, which means §§ 3322(d) and 3327's statutory procedures are *not* that election mechanism. Appx17. The § 3322(a) election mechanism developed by the

---

[10] More broadly, § 3322(a) is the Post-9/11 program-specific implementation of Congress's long-standing concurrent-receipt bar across all programs. *E.g.*, Pub. L. 98-223, § 203(b), 98 Stat. 41 (Mar. 2, 1984); 38 U.S.C. § 3681(b) ("No person may receive benefits concurrently under two or more of the provisions of law listed below."). Program-specific concurrent-receipt bars have been in every program since 1952.

Secretary prevents individuals from receiving benefits "from more than one program during . . . [an] applicable pay period, but" allows those with separately established entitlements to "switch freely between programs." Appx23, Appx26 (citing 38 C.F.R. §§ 21.4022, 21.9690, 21.9635(w)). This mechanism builds off of decades-old, identical requirements under other GI Bill programs, which the Secretary simultaneously revised with the implementation of the Post-9/11 regulations. *E.g.*, 74 Fed. Reg. 14,654, 14,670-71 (Mar. 31, 2009). When promulgating these regulations, the Secretary explained that they apply to individuals "who are eligible for the Post-9/11 GI Bill and another educational assistance program *at the same time*," who may consecutively switch between separately established entitlements outside of the benefit-exchange election provisions in §§ 3322(d) and 3327. *Id.* at 14,661 (emphasis added).

### iv. Period of service elections

Section 3322(h)(1) also informs the plain meaning of §§ 3322(d) and 3327. Congress enacted § 3322(h)(1) soon after the creation of the Post-9/11 program to address problems it had identified with §§ 3322(d) and 3327. S. Rep. No. 111-346, at *19 (2010), *as reprinted in* 2010 U.S.C.C.A.N. 1503; *see also infra* at 63 (discussing legislative history).

41

Under the heading "Bar To Duplication of Eligibility Based on a Single Event or Period of Service," § 3322(h)(1) provides:

> An individual with qualifying service in the Armed Forces that establishes eligibility on the part of such individual for educational assistance under this chapter [and Montgomery or certain other programs], shall elect (in such form and manner as the Secretary may prescribe) under which authority such service is to be credited.

As the Veterans Court explained, § 3322(h)(1) "mandate[s] a primary election, an initial choice among programs for those who haven't yet tried to use educational assistance attributable to" any given period of service. Appx25. The negative implication of § 3322(h)(1)'s bar on the duplication of GI Bill benefit eligibility based on a single period of "qualifying service" is that there is no duplication, and therefore no bar, on eligibility for multiple benefits based on multiple periods of "qualifying service." *DWA Holdings*, 889 F.3d at 1371.

Tellingly, just like § 3322(a), § 3322(h)(1) charges the Secretary with developing a regulatory method of making period-of-service elections, meaning §§ 3322(d) and 3327's statutory procedures are not it. Appx32-33. Since § 3322(h)(1)'s enactment, the Secretary has not promulgated any new regulations to implement it. This suggests that the preexisting Post-9/11 program regulations allowing individuals "who are

42

eligible for the Post-9/11 GI Bill and another educational assistance program *at the same time*" to consecutively switch between programs outside of the benefit-exchange election provisions adequately do so. 38 C.F.R. §§ 21.4022, 21.9690, 21.9635(w); 74 Fed. Reg. at 14,661 (emphasis added).[11]

Like the entitlement and concurrent-receipt bar provisions discussed above, the meaning of § 3322(h)(1)'s period-of-service requirement is informed by the mirror-image provisions upon which it is based. Section 3322(h)(1) is the active-duty service corollary to the Post-9/11 program's preexisting reserve service crediting requirement found in § 3322(c). It also mirrors multiple other period-of-service election provisions under other programs, long-understood to permit alternating, consecutive usage of separately established entitlements. *E.g.*, 38 U.S.C. § 3033(c) (requiring crediting "such service" that qualifies for multiple

---

[11] This confirms that the Secretary's attempt to read into § 3322(h)(1) various restrictions related to dual entitlement or confirmation that only after § 3322(h)(1)'s enactment did Congress know how to differentiate between veterans with single or multiple periods of service, is incorrect. Sec'y.Br.37. Section 3322(h)(1)'s language is straightforward, and simply requires veterans to have and assign separate service for separate benefits; no more, no less.

programs (including the Post-9/11 to one program or another). The Secretary's M22-4 Manual, which provides implementing instructions on the Post-9/11 and other GI Bill programs, explains that § 3322(h)(1) makes the Post-9/11 program fully "consistent with all other GI Bill programs" in regards to period of service elections, allowing a veteran to "point a period of service to one benefit instead of another," to ensure "[a] specific single period of service" is not "used towards establishing eligibility for more than one benefit." Manual at Pt.4, § 3.02(a),[12] Pt.3, § 3.10, (a)(1).[13] The Secretary's position is at odds with the statute's plain language, its context in the greater GI Bill program, his regulations, and his own manual.

Plainly, § 3322(h)(1) gives veterans with multiple periods of qualifying service, like Mr. Rudisill, the right to attribute a period of qualifying service not attributed to their Montgomery entitlement to the Post-9/11 program to obtain benefits thereunder. That is precisely what Mr. Rudisill tried to do, indicating on his benefits application form that he was applying for Post-9/11 benefits with service post-dating the

---

[12] https://perma.cc/9DU8-HXPE?type=image

[13] https://perma.cc/XUY8-JZSN?type=image

service that established his Montgomery entitlement. Appx585 (crediting 2004-2011 service).

Attempting to overcome this, the Secretary reads into § 3327 non-existent language making it applicable only to veterans with "dual entitlements" based on multiple periods of service. Sec'y.Br.21. Nowhere does § 3327 say this, as the Secretary spends pages of his brief dancing around, *see, e.g.*, Sec'yBr.23-25 ("2. Section 3327 Does Not Differentiate Between Veterans Based On Their Number of Periods Of Service"), just as it does not say § 3327 is the only route under which Post-9/11 benefits can be obtained for those with established Montgomery benefits. The Secretary ignores that § 3322(h)(1) expressly applies to any given period of "*qualifying service*," not *individuals* with no more than a single period of qualifying service. That is what it says and how the Veterans Court interpreted it. Appx25.

Moreover, the Secretary's atextual argument that § 3322(h)(1) somehow prohibits a benefit-exchange election by a veteran with a single period of service once the "veteran actually applies to *use* Montgomery benefits," Sec'y.Br.36-37, is baseless for at least two reasons. First, Congress did not make elections under § 3322(h)(1) "irrevocable," as it

has done for certain other types of veterans' benefits elections. *Cf.* 38 U.S.C. § 3327(i).[14] Second, the plain language of the benefit-exchange provisions central to this case unequivocally allow precisely that, as explained further in the next section.

### v. Benefit-exchange elections

Congress created a simple and easy route to Post-9/11 benefits in §§ 3311 and 3312, mirroring its prior benefits programs. *E.g.*, 38 U.S.C. 3011. In so doing, as explained, it added the same concurrent-receipt bar and period-of-service election requirements to prevent double-dipping and nothing more. This allows the Post-9/11 program to reside with its sister programs harmoniously, permitting veterans with separate periods of qualifying service to obtain multiple benefits subject only to the 48-month cap in § 3695(a).

Nevertheless, Congress faced a novel issue when it created the Post-9/11 GI Bill: it enacted a benefits program with a qualifying service start date eight years earlier, which overlapped with its existing

---

[14] *See also* 38 U.S.C. §§ 1511(c)(1), 1512(a)(3)(A), 1980(f)(1), 3012(e)(2), 3202(1)(D)(i), 3311(f)(3); 10 U.S.C. §§ 510(f), 1175(e)(3)(B), 2146(a), 12524(c), 16163(d).

Montgomery program. This meant that nearly all veterans with qualifying post-9/11 service had automatically credited their first two or three years of qualifying service to the Montgomery program, unless in the unlikely chance they opted out at the point of enlistment. 38 U.S.C. § 3011(b)-(c); *see supra* at 9-10 ("[a]t least *95 percent* of servicemembers enroll[ed] in [the Montgomery] program" at time of Post-9/11 program's enactment). For some, this inevitably represented *all* of their qualifying service for establishing entitlement to either GI Bill program.

To give such veterans a chance to re-credit their service to the new, Post-9/11 program, Congress created a unique benefit-exchange election process. Found in §§ 3322(d) and 3327, this benefit-exchange election process allows otherwise eligible veterans to receive Post-9/11 benefits for any given period of service already locked into a vested or inchoate entitlement to benefits under another program.

*Section 3322(d) defines § 3327's role:*
*coordination of entitlement*

Section 3322(d) falls under the Post-9/11 program's broader bar to duplication of benefits section within the "Administrative Provisions" subchapter. It provides that a veteran with vested or inchoate "entitle[ment] to" Montgomery benefits can "coordinat[e]" it into

47

"entitlement to educational assistance under this chapter." 38 U.S.C. § 3322(d). Any such coordination "shall be governed by the provisions of section 5003(c) of the Post-9/11 Veterans Educational Assistance Act of 2008," which refers to what is today § 3327.

It is § 3322(d)'s reference to "coordination" and "entitlement" that informs its meaning. Entitlements to GI Bill benefits are indisputably based on discrete periods of qualifying service credited to a certain program. Initial crediting of service occurs under the Montgomery program at the point of enlistment, 38 U.S.C. §§ 3011(b), 3012(c), undermining the Secretary's assertion that crediting occurs only when a veteran attempts to "use" Montgomery benefits, Sec'y.Br.36-37. Indeed, § 3327 plainly extends to those veterans within their first 12 months of service still "making [monetary] contributions" towards fully establishing Montgomery entitlement and allows for halting further such contributions within that first year of service. 38 U.S.C. § 3327(a)(1)(E), (b). It is the coordination of such vested or inchoate entitlement, which is *based on* any given period of qualifying service credited to establish that entitlement, that is the focus of § 3322(d) (and therefore § 3327).

48

As the Veterans Court explained, Congress was concerned under
§ 3322(d) only with "'duplication' or double-dipping," so "if there's no
'duplication,' there's no cause for concern." Appx16. Consistent with
common sense and historical practice, there is no duplication of benefits
when entitlement to different programs is based on separate periods of
qualifying service. Appx28. Thus, nothing need be coordinated in that
case. Under the Veterans Court's correct interpretation, § 3322(d) would
rightly allow the coordination of Montgomery benefits into Post-9/11
benefits based on any period of service previously credited to
Montgomery entitlement. Appx25 (discussing role of § 3322(d) after a
claim for non-Post-9/11 benefits has been decided). But it would not
require such coordination where entitlement to Post-9/11 benefits can be
established by a separate period of qualifying service.

*Section 3327 resolves*
<u>*complexities of the coordination*</u>

The term coordination in § 3322(d) is not defined, but one is directed
to § 3327 for what it might mean. Section 3327's plain terms oblige.

The section immediately informs that any coordination is
voluntary. 38 U.S.C. § 3327(a) (veteran "may elect" to coordinate). This
permissive rather than mandatory language suggests § 3327 is not the

exclusive way of obtaining Post-9/11 benefits, which the Secretary's implementing regulations confirm. 38 C.F.R. § 21.9520(a)-(c) (outlining three ways of establishing Post-9/11 entitlement, only one of which requires a benefit-exchange election).

Moreover, § 3327 says individuals "may elect" to receive Post-9/11 benefits "instead of" a benefit identified under § 3322(d). 38 U.S.C. § 3327(a), (d). To be eligible to obtain Post-9/11 benefits "instead of" another, as relevant here, the veteran must have vested or inchoate entitlement to Montgomery benefits (that is, someone that already credited a period of service to the Montgomery program) *and* must meet the Post-9/11 program's entitlement criteria, which are in §§ 3311-12. *Id.* § 3327(a)(1)(A), (C), (E), (a)(2). This latter point is salient, as it makes clear that § 3327 is not an entitlement provision; it does not replace, modify, or condition the Post-9/11 program's entitlement criteria in §§ 3311-12, but instead relies upon them. Thus, for those who previously elected to credit otherwise qualifying post-9/11 service towards the Montgomery program, a benefit-exchange election under § 3327 would merely allow them a "second election" to credit that service to the Post-9/11 program. Appx25.

The foregoing text demonstrates unequivocally that the "coordination" at issue in § 3322(d), and thus the full scope of § 3327, involves *any* given post-9/11 period of qualifying service that could be credited to either Montgomery or Post-9/11 benefits. The eligibility section of § 3327 simply does not speak to a veteran like Mr. Rudisill who has established Montgomery entitlement based on one period of service (some of which was pre-9/11) but has additional service thereafter that separately qualifies for Post-9/11 benefits under §§ 3311-12.[15]

### *The purpose of §§ 3322(d) and 3327*

Practically speaking, it is easy to understand why Congress would allow this. As noted, veterans had been serving from September 11, 2001 and crediting potentially all of their qualifying service to other programs for eight years prior to the effective date of the Post-9/11 program (August 1, 2009), which Congress made retroactively applicable. 38 U.S.C. § 3311. Congress wanted to ensure the maximum number of post-9/11 veterans,

---

[15] For this reason, Mr. Rudisill does dispute that he meets the "parameters" of § 3327(d)(2). Sec'y.Br.21-22. He has "used, but retains unused" Montgomery entitlement and seeks Post-9/11 benefits, but this does not dictate whether he was "making an election under" § 3327(a). *See* 38 U.S.C. 3327(d)(2).

both on August 1, 2009 and moving forward, could take advantage of its enhanced benefits befitting their "arduous" service, Pub. L. No. 110-252, Title V, § 5002, 122 Stat. 2357, but knew that qualifying service credited towards establishing Montgomery entitlement at the point of enlistment could not be used to establish Post-9/11 entitlement. Without a benefit-exchange election process, countless post-9/11 era veterans with sufficient qualifying service for only one benefit or the other would be left out in the cold.

*The Secretary's contrary interpretation*
*<u>entirely misses the point of §§ 3322(d) and 3327</u>*

The Secretary's laser-focus on § 3327(d)(2)(A) forgets § 3327's most important language—the eligibility terms of § 3327(a), discussed above. Subsection (d) only applies to those "making an election under subsection (a)." 38 U.S.C. 3327(d)(1). This reinforces both the voluntary nature of engaging in the benefit-exchange process, and that (d) only applies to those seeking to trade benefits based on a period of service used to establish an entitlement outlined in § 3327(a)(1). If that were not enough, § 3327(d)(2) repeats its applicability only to those "making an election" to exchange Montgomery benefits. This language compels the conclusion that §§ 3322(d) and 3327 are concerned only with exchanging certain

benefits for others; these sections say nothing of imposing an entitlement dragnet for all periods of service any member might ever serve, and which might qualify for other benefits or might qualify a veteran, like Mr. Rudisill, for Post-9/11 benefits outside of some kind of exchange (*i.e.*, under §§ 3311-12).

The Secretary also argues that § 3327 does not differentiate between veterans based on their number of periods of qualifying service. Sec'y.Br.23-25. While this is at odds with the Secretary's insistence that § 3327 somehow *only* applies to veterans with multiple periods of qualifying service post § 3322(h)(1)'s enactment, Sec'y.Br.35-38, the Secretary misunderstands Mr. Rudisill's argument and the Veterans Court's interpretation. Both have always been, at bottom, that §§ 3322(d) and 3327 are not "strings attached to educational assistance received under more than one program." Appx25. The provisions properly understood within the statutory framework simply provide a means to exchange a previous election of benefits based on one period of qualifying service for benefits under the Post-9/11 program based on that *same* period of qualifying service, regardless of whether the veteran has one or more periods of qualifying service. The relevant trigger is, thus, whether

the veteran chooses to "coordinat[e]" an existing entitlement in this manner, not whether they have one or more periods of qualifying service. Yet, as the Veterans Court explained, the Secretary's application form does not give veterans that choice, forcing *everyone* with remaining Montgomery entitlement, regardless of their periods of qualifying service, into § 3327's procedures based on the Secretary's incorrect legal interpretation. Appx34. As discussed, nothing in §§ 3322(d) or 3327 compel this outcome.

Similarly, nothing in the text of all of Chapter 33, much less §§ 3322(d) and 3327, supports the Secretary's position that Mr. Rudisill could qualify for Post-9/11 benefits only after he exhausts his Montgomery benefits. Sec'y.Br.23. Certainly, nothing in the Post-9/11 entitlement provisions of §§ 3311-12 require such exhaustion. The term exhaust does not appear in §§ 3322 or 3327. It is unclear how § 3327 can "unambiguously" require exhaustion, as the Secretary claims, when it does not use the term and makes no reference to how or when veterans must use Montgomery benefits.

Likewise, some veterans are not "unfairly privilege[ed]" over others by the Veterans Court's interpretation. Sec'y.Br.27. While the Secretary

54

correctly points out "that veterans and the VA have to make service and education decisions in real time, before either necessarily knows what any veteran's full service career might look like," Sec'y.Br.29-30, he again entirely misses the point of §§ 3322(d) and 3327. As supported by the numerous other textual indicators in the statutory scheme, a veteran with a single period of qualifying service who applies for Post-9/11 benefits via a benefit-exchange election simply irrevocably re-credits *that* period of qualifying service to Post-9/11 entitlement. Should the veteran subsequently be able to establish entitlement to benefits under a different program, based on a separate period of qualifying service, she can do so under other provisions of the GI Bill's statutory framework, just as Mr. Rudisill seeks to do. This Court's decision in *Carr* provides but one example of this, where the veteran earned benefits under both the Vietnam and Post-9/11 programs by his service separated by decades. *Carr*, 961 F.3d at 1170. It also highlights the importance of interpreting the overlapping, interrelated GI Bill framework with "'as great an internal symmetry and consistency as its words permit,'" *Keystone Consol.*, 508 U.S. at 159, which requires not reading §§ 3322(d) and 3327 as the Secretary argues.

### vi.  48-month aggregate cap

Another textual indicator that §§ 3322(d) and 3327 should not be read as foreclosing Congress's traditional treatment of multiple entitlements based on separate periods of qualifying service is found in 38 U.S.C. § 3695(a). That provision provides:

> (a) The aggregate period for which any person may receive assistance under two or more of the provisions of law listed below may not exceed 48 months (or the part-time equivalent thereof):
>
> . . .
>
> (4) Chapters 30, 32, 33, 34, and 36.

Chapters 30 and 33 are the Montgomery and Post-9/11 programs, respectively.

The inclusion of the Montgomery and Post-9/11 programs in § 3695(a) further informs the meaning of §§ 3322(d) and 3327. While this Court has explained that Chapter 36, where § 3695(a) is located, "is not a source of veterans benefits," *Carr*, 961 F.3d at 1174, § 3695(a) clearly contemplates that some veterans will be able to use benefits under those programs up to the 48-month cap. As the Veterans Court rightly explained, § 3695(a) is a strong indication Congress did not intend, through its benefit-exchange election provisions, to limit the total months

of benefits available under the two programs in a way that would render § 3695(a) "largely a nullity." Appx27n.13.

*Carr* is instructive. *Carr* considered whether Congress's separation of certain end-of-term extension provisions from § 3695's predecessor indicated an intent to no longer allow individuals whose benefits expire in the middle of a school term to receive benefits *in excess* of 48 months. 961 F.3d at 1175. The Court held that § 3695 applied as an "initial entitlement calculation" that can be exceeded under program-specific end-of-term extension provisions. *Id.* Here, the concerns are reversed and far graver than in *Carr*. There is no "clear indication that Congress wished to impose the harsh consequence" of "multi-program beneficiaries" with separate periods of qualifying service being unable to obtain benefits *up to* the 48-month cap, should they wish to obtain Post-9/11 benefits before exhausting their Montgomery entitlement. *Id.* at 1176. To the contrary, Congress expressly made the Post-9/11 program "subject to" § 3695(a), amended § 3695(a) to identify the Post-9/11 program alongside the Montgomery program for combined use, and made numerous corresponding revisions to other GI Bill programs to allow

consecutive usage with Post-9/11 benefits. *E.g.*, 38 U.S.C. §§ 3312(a),
3695(a)(4), 3033(a).

The answer to the Court's second question, therefore, must be that
§ 3327(d)(2) limits the months of benefits a veteran can obtain for any
given single period of qualifying service initially used to establish
entitlement to Montgomery benefits and then exchanged to establish
entitlement to Post-9/11 benefits. Section 3695(a) then imposes a
cumulative limitation on aggregate benefits a veteran may obtain for *any*
additional periods of qualifying service. Mr. Rudisill has such additional
qualifying service with which to separately establish his Post-9/11
entitlement. He simply seeks to establish entitlement on that basis, not
via a benefit-exchange election. Nothing in the plain language of
§§ 3322(d) or 3327 address or prevents him from so doing.

### b. The legislative history of the statutory scheme further supports the Veterans Court's interpretation

To the extent there was any doubt about the plain meaning of
§§ 3322(d) and 3327 when read in context with the broader statutory
scheme, the legislative history of the key provisions at issue here provides
further support for the Veterans Court's interpretation and undermine
the Secretary's.

First, over 50 years ago, Congress set out to make clear through § 3695(a)'s predecessor that separate periods of qualifying service could establish entitlements to programs listed under the statute, up to its 48-month aggregate cap. When the only programs that existed were the original GI Bill for World War II service, the Korean War GI Bill for service during that conflict, and certain other programs for survivors and disabled veterans, § 3695(a)'s predecessor *eliminated* a limitation that would have capped aggregate entitlement to 36 months for separate periods of qualifying service. Congress explained that the change in law would "allow an eligible veteran to use at least 12 months of any entitlement that he earned as a result of post-Korean service, notwithstanding the fact that he had previously received a full 36 months of education or training under one or more of the other Veterans' Administration education assistance program or programs." S. Rep. No. 90-1394 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 4486-87.

The rationale was simple. The Korean War GI Bill was "intended to assist the veteran in readjusting to civilian life *following his period of post-Korean service.*" *Id.* (emphasis added). "The fact that he may have had previous training at Government expense under a different program

59

may minimize, and in many cases might obviate, the need for further readjustment assistance; but, if the veteran finds that he does need additional education, such as a master's degree to successfully enter into a teaching profession, the opportunity should be open to him. The notion is that we reward extra service and recognize that further education today may be necessary for adequate readjustment." *Id.*

The same rationale applies to the Post-9/11 program, which is subject to § 3695(a) alongside the Montgomery program. The former program was intended to recognize and provide readjustment following a period of arduous wartime service. The latter was intended to recognize and provide readjustment following a period of peacetime service. By including both within § 3695(a), Congress clearly indicated its intent to allow additional benefits for separate periods of qualifying service.

Second, the legislative history of the enactment of the Post-9/11 Veterans Educational Assistance Act of 2008 is relevant to understanding the role of benefit-exchange elections under the statutory scheme. As explained below, it is clear from the testimony of Senate Veterans Affairs Committee members and VA officials at hearings that it was understood that benefit-exchange elections would only be

necessary to re-credit a period of service previously credited to Montgomery entitlement.

S. 22 was authored by Senator Jim Webb of Virginia, a Vietnam veteran, GI Bill beneficiary, and former Secretary of the Navy, who introduced the bill on his first day in office. *A Conversation with U.S. Senator Jim Webb*, 35 Fordham Int'l L. Journal 1593, 1607 (2012). As a result, his statements on S. 22 are "to be accorded substantial weight in interpreting the statute." *Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 564 (1976).

In describing S. 22, Senator Webb explained that it was "designed to expand the educational benefits" available to post-9/11 veterans. *Hearing on Pending Benefits Legislation: Hearing Before the S. Comm. On Veterans' Affs.*, 110th Cong. 6 (2007).[16] Benefits under the Post-9/11 program would "be paid for a duration of time that is linked to time served in the military," and veterans would only "be barred from receiving *concurrent* assistance from this program and another similar program, such as the Montgomery" program. *Id.* (emphasis added).

---

[16] https://perma.cc/39UA-VJTS

61

Senator Webb further explained that S. 22 was all about "equity. It is equity for service." *Hearing on DOD/VA Collaboration And Cooperation On The Education Needs of Returning Servicemembers: Hearing Before the S. Comm. On Veterans' Affs.*, 110th Cong. 3 (2007).[17]

VA officials likewise recognized that nothing about S. 22's benefit-exchange election provisions would change the concept of multiple entitlements based on separate periods of qualifying service. In response to a question about the VA's early concerns with the complexity of the bill, the Director of VA's Education Service explained that "[i]f the individual is eligible for more than one program based on different periods of service, the complexity is in understanding the different rules for each program and selecting the most beneficial [to use]. Many individuals, especially those serving since September 11, 2001, are eligible under more than one program based on the same period of service and must decide under which program to credit their military service." *Hearing on Pending Benefits Legislation: Hearing Before the S. Comm. On Veterans' Affs.*, 110th Cong. 20 (statement of Dir. Keith Wilson).[18]

---

[17] https://perma.cc/FNC9-M4KC

[18] https://perma.cc/39UA-VJTS

Finally, the legislative history of § 3322(h)(1) is also instructive. The Senate Report underlying that provision explains in detail that Congress was concerned only with the duplication of entitlement based on the exact same period of service. S. Rep. No. 111-346, at *19 (2010), *as reprinted in* 2010 U.S.C.C.A.N. 1504 (discussing hypothetical of someone obtaining two benefits for only three years of service). Nowhere does it suggest that Congress intended through § 3322(h)(1) to dictate that benefit-exchange elections under §§ 3322(d) and 3327 are available only to veterans with multiple periods of qualifying service, as the Secretary argues. Sec'y.Br.37.

### c. The pro-veteran canon resolves any ambiguity in the statutory scheme in favor of veterans with separate periods of qualifying service

If the statutory text and legislative history were not enough to conclude the Veterans Court's interpretation is correct, an additional consideration compels it. Under the rule that interpretive doubt in veterans' benefits statutes is resolved in veterans' favor, *Gardner*, 513 U.S. at 118, any ambiguity surrounding how §§ 3322(d) and 3327 fit

within the broader statutory scheme cannot be interpreted to impose the Secretary's bar.

Any ambiguities in statutes should be resolved through application of traditional tools of statutory construction, such as the pro-veteran canon. *Chevron USA, Inc. v. NRDC*, 467 U.S. 837, 843 n.9 (1984) (a statute is "ambiguous" only *after* exhausting such tools).[19] "The pro-veteran canon instructs that provisions providing benefits to veterans should be liberally construed in the veterans' favor, with any interpretative doubt resolved to their benefit." *Procopio v. Wilkie*, 913 F.3d 1371, 1383 (Fed. Cir. 2019) (*en banc*) (O'Malley, J., concurring). Like the analogous pro-Indian canon, the pro-veteran canon counsels against "lightly infer[ing]" derogation of benefits, instead requiring veterans' benefits statutes "be construed in favor" of rights. *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2470 (2020).

---

[19] To be clear, the Secretary does not request *Chevron* deference. That is telling, as agencies with pages of implementing regulations regularly seek shelter under *Chevron*. Perhaps it is because the Secretary's all support Mr. Rudisill's position, as the Veterans Court found. Appx25-27; *e.g.*, 38 C.F.R. §§ 21.9520(a)–(c) (outlining three ways of establishing Post-9/11 entitlement, only one of which requires a benefit-exchange election).

The Veterans Court concluded that "to the extent a question remained," if the pro-veteran canon "would ever have a real effect on an outcome, it would be here." Appx29. Mr. Rudisill agrees.

The Court has before it two dueling interpretations that are premised on competing tools of statutory construction pulling in opposite directions. A panel majority of this Court, the Veterans Court, Mr. Rudisill, and the Secretary's regulations posit a reasonable reading of the statutory scheme, read in context and as a harmonious whole, that gives effect to all of the statutory language and purpose, and is equitable to all veterans. The Secretary posits in this litigation a different reading of §§ 3322(d) and 3327, in isolation from the statutory scheme, but in purported adherence to the "plain" text of those isolated provisions. If given pause, the Court should apply the pro-veteran canon to resolve any "remaining interpretive doubt" about the role of §§ 3322(d) and 3327 within the statutory scheme. *See Kisor v. McDonough*, 995 F.3d 1316, 1325-26 (Fed. Cir. 2021) (the canon applies in the event of "interpretive doubt" following "the use of ordinary textual analysis tools");[20] *see also*

---

[20] Mr. Rudisill does not concede that the pro-veteran canon applies only at the backend of statutory analysis. If anything, this case illustrates

Appx7 (concluding "the statutory scheme Congress enacted is ambiguous").

Under the pro-veteran canon, it cannot be that Congress intended for post-9/11 veterans with separately qualifying service to exhaust or relinquish entitlement to Montgomery benefits before obtaining Post-9/11 benefits. As explained in the preceding sections, none of the text, context, purpose, or legislative history reflect such a requirement. Moreover, the principal focus of debate when the Post-9/11 GI Bill was enacted was on encouraging *additional* service, and providing *additional* benefits. *E.g.*, Joseph Keillor, Note, *Veterans at the Gates: Exploring the New GI Bill and Its Transformative Possibilities*, 87 Wash. U. L. Rev. 175, 177-81 (2009). If Congress believed separately qualifying service were irrelevant under the Post-9/11 program, one would expect there to be some discussion of this in the legislative history. The Court would search in vain for any such discussion and, as discussed *supra*, actually find the opposite.

---

exactly why statutory analysis should begin with Congress's pro-veteran goals in mind. *See Kisor*, 995 F.3d at 1327 (Reyna, J., dissenting) ("canon must be weighed alongside the other traditional tools in resolving interpretive doubt, including whether interpretative doubt exists").

It is hard to fathom that Congress understood §§ 3322(d) and 3327 as imposing an unprecedented limit on dual entitlements. Members of Congress would have had to believe they were (a) taking away benefits available to post-9/11 veterans under other programs, should they want Post-9/11 benefits, and (b) limiting the amount of Post-9/11 benefits available to eligible veterans based solely on when applied for, not whether any duplication of benefits for the same service occurred. Again, the Court would search in vain for evidence of this.

To fully appreciate this point, consider again that Congress left intact the provision automatically enrolling members in the Montgomery program upon enlistment, unless they opted out affirmatively, resulting in nearly all new servicemembers crediting their first period of service to Montgomery. *See supra* at 9-10. Under the Secretary's position, Congress would have known this, and intended, through the term "coordination" and a process in an uncodified note, to funnel all veterans into a position where they either had to exhaust or relinquish Montgomery benefits to get Post-9/11 benefits. This would limit nearly all post-9/11 veterans to either an aggregate of 36 months of total benefits, despite Congress stating its intent was to provide *additional* benefits for arduous service,

Pub. L. No. 110-252, Title V, § 5002, 122 Stat. 2357, or no more than 12 months of Post-9/11 benefits, despite § 3312 establishing a default 36-months entitlement. It also would render much of Chapter 33 window dressing.

There can be no basis to believe Congress intended what the Secretary argues. Moreover, the Secretary cannot explain *why* Congress would require that. The Veterans Court's interpretation gives voice to equitable legislative policy, consistent with Congress's past practice of barring the duplication of benefits for the same service only and permitting consecutive usage of separately established entitlements, as well as the Secretary's own Post-9/11 program implementing regulations.

The Secretary's interpretation, meanwhile, finds no precedent in veterans' benefits law. It is unrecognizable as the command of a Congress concerned with incentivizing recruitment and retention during a time of war or fulfilling the Nation's desire to assist its longest serving veterans in readjusting to civilian life afterwards. Yet, as the Secretary explains it, §§ 3322(d) and 3327 are effectively a trap for the unwary, limiting benefits based on when an application is filed or benefits used, without concern for separately qualifying service. *See Acree v. O'Rourke*, 891 F.3d

1009, 1013 (Fed. Cir. 2018) (VA "system is not meant to be a trap for the unwary, or a stratagem to deny compensation to a veteran who has a valid claim"); *Barrett v. Nicholson*, 466 F.3d 1038, 1044 (Fed. Cir. 2006) ("The government's interest in veterans cases is not that it shall win, but rather that justice shall be done, that all veterans so entitled receive the benefits due to them."). What rational legislative policy would require that?

These are *extraordinary* red flags under the pro-veteran canon of construction. Indeed, the whole system is blinking red. The Secretary's interpretation is not what any Congress that cares about qualifying service of post-9/11 veterans intended.

### d. The Secretary's position produces absurd results unfavorable to most veterans

Finally, the Secretary disputes that the Veterans Court's interpretation is more veteran-friendly. Sec'y.Br.26-30. But it is—overwhelmingly so.

The Secretary's interpretation leads to absurd results. The best way to illustrate this is to compare side-by-side hypotheticals under his interpretation and the Veterans Court's:

69

| Hypothetical | Veterans Court's interpretation | Secretary's interpretation |
|---|---|---|
| Veteran serves continuously from 2001 to 2021. She applies for Post-9/11 benefits before using any Montgomery benefits. | Under § 3322(h)(1), the veteran makes period-of-service elections to credit 36 months of service to the Post-9/11 program, and a separate 36 months of service to the Montgomery program.<br><br>She receives full entitlement to benefits under both programs, which she may use consecutively as she sees fit subject to the 48-month cap. | Under § 3327, the veteran cannot obtain Post-9/11 benefits while still entitled to Montgomery benefits and must make a benefit-exchange election. She revokes her Montgomery entitlement. Her Post-9/11 entitlement is limited to the amount of revoked Montgomery benefits.<br><br>She receives 36 months of total benefits, all Post-9/11. |
| Same as above, but veteran applies for Post-9/11 benefits after using 12 months of Montgomery benefits. | Same as above. | Same as above, but different breakdown of benefits: 24 of Post-9/11; 12 of Montgomery. |
| Same as above, but veteran applies for Post-9/11 benefits after using 35 months of Montgomery benefits. | Same as above. | Same as above, but different breakdown of benefits: 1 month of Post-9/11; 35 of Montgomery. |

| | | |
|---|---|---|
| Veteran serves 36 months after 9/11. She uses the Montgomery GI Bill for 6 months to attend a trade school, but then applies for Post-9/11 benefits to attend a four-year degree program. | The veteran makes a benefit-exchange election under §§ 3322(d) and 3327, which contemplate exactly this scenario, re-crediting her single period of qualifying service from Montgomery to Post-9/11 entitlement.<br><br>She receives 6 months of Montgomery benefits, and 30 of Post-9/11 for her period of qualifying service. | Section 3322(h)(1) somehow precludes veterans with a single period of qualifying service from making benefit-exchange elections.<br><br>Despite being otherwise eligible for Post-9/11 benefits, this veteran's prior period-of-service election of Montgomery benefits results in her being denied Post-9/11 benefits. |

Plainly, the Veterans Court's interpretation is more friendly, equitable, logical, and consistent than the Secretary's. Congress could not have intended what the Secretary has done and continues to advocate.

## Conclusion

For the foregoing reasons, the Court should dismiss the Secretary's untimely authorized appeal for lack of jurisdiction. In the alternative, if the Court reaches the merits, it should affirm the Veterans Court's decision.

Respectfully submitted,

/s/ Timothy L. McHugh
Timothy L. McHugh
Abbey M. Thornhill
TROUTMAN PEPPER HAMILTON
SANDERS LLP
1001 Haxall Point
Richmond, VA 23219
(804) 697-1365

David J. DePippo
DOMINION ENERGY SERVICES INC.
Riverside 2
120 Tredegar Street
Richmond, VA 23219
(804) 819-2411

*Counsel for Claimant-Appellee*

## CERTIFICATE OF COMPLIANCE
## PURSUANT TO FED. R. APP. P. 32(g)(1)

This brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1). The brief contains 13,376 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

June 21, 2022

/s/ Timothy L. McHugh
Timothy L. McHugh

*Counsel for Claimant-Appellee*

# ADDENDUM

United States Code Annotated
   Title 28. Judiciary and Judicial Procedure (Refs & Annos)
     Part II. Department of Justice (Refs & Annos)
      Chapter 31. The Attorney General (Refs & Annos)

28 U.S.C.A. § 518

§ 518. Conduct and argument of cases

Currentness

**(a)** Except when the Attorney General in a particular case directs otherwise, the Attorney General and the Solicitor General shall conduct and argue suits and appeals in the Supreme Court and suits in the United States Court of Federal Claims or in the United States Court of Appeals for the Federal Circuit and in the Court of International Trade in which the United States is interested.

**(b)** When the Attorney General considers it in the interests of the United States, he may personally conduct and argue any case in a court of the United States in which the United States is interested, or he may direct the Solicitor General or any officer of the Department of Justice to do so.

**CREDIT(S)**

(Added Pub.L. 89-554, § 4(c), Sept. 6, 1966, 80 Stat. 613; amended Pub.L. 96-417, Title V, § 503, Oct. 10, 1980, 94 Stat. 1743; Pub.L. 97-164, Title I, § 117, Apr. 2, 1982, 96 Stat. 32; Pub.L. 102-572, Title IX, § 902(b)(1), Oct. 29, 1992, 106 Stat. 4516.)

Notes of Decisions (18)

28 U.S.C.A. § 518, 28 USCA § 518
Current through P.L. 117-139. Some statute sections may be more current, see credits for details.

**End of Document**      © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 28. Judicial Administration
    Chapter I. Department of Justice
      Part 0. Organization of the Department of Justice (Refs & Annos)
        Subpart D. Office of the Solicitor General

28 C.F.R. § 0.20

§ 0.20 General functions.

Currentness

The following-described matters are assigned to, and shall be conducted, handled, or supervised by, the Solicitor General, in consultation with each agency or official concerned:

(a) Conducting, or assigning and supervising, all Supreme Court cases, including appeals, petitions for and in opposition to certiorari, briefs and arguments, and, in accordance with § 0.163, settlement thereof.

(b) Determining whether, and to what extent, appeals will be taken by the Government to all appellate courts (including petitions for rehearing en banc and petitions to such courts for the issuance of extraordinary writs) and, in accordance with § 0.163, advising on the approval of settlements of cases in which he had determined that an appeal would be taken.

(c) Determining whether a brief amicus curiae will be filed by the Government, or whether the Government will intervene, in any appellate court.

(d) Assisting the Attorney General, the Deputy Attorney General and the Associate Attorney General in the development of broad Department program policy.

**Credits**

[Order No. 423–69, 34 FR 20388, Dec. 31, 1969, as amended by Order No. 445–70, 35 FR 19397, Dec. 23, 1970; Order No. 960–81, 46 FR 52341, Oct. 27, 1981]

SOURCE: Order No. 423–69, 34 FR 20388, Dec. 31, 1969, as amended by Order 445–70, 35 FR 19397, Dec. 23, 1970; 51 FR 31940, Sept. 8, 1986; 52 FR 17951, May 13, 1987; 52 FR 24447, July 1, 1987; 52 FR 44971, Nov. 24, 1987; 53 FR 10871, April 4, 1988; 53 FR 31323, Aug. 18, 1988; 54 FR 816, Jan. 10, 1989; 54 FR 47353, Nov. 14, 1989; 54 FR 50739, Dec. 11, 1989; 55 FR 1583, Jan. 17, 1990; 55 FR 20456, May 17, 1990; 55 FR 27808, July 6, 1990; 55 FR 40654, Oct. 4, 1990; 56 FR 12350, March 25, 1991; 56 FR 21600, May 10, 1991; 56 FR 25629, June 5, 1991; 58 FR 62260, Nov. 26, 1993; Order No. 1975–95, 60 FR 35335, July 7, 1995; Order No. 2078–97, 62 FR 23658, May 1, 1997, unless otherwise noted.

AUTHORITY: 5 U.S.C. 301; 28 U.S.C. 509, 510, 515–519.

Notes of Decisions (8)

Current through June 17, 2022, 87 FR 36410, except for 40 CFR § 52.220, which is current through May 6, 2022. Some sections may be more current. See credits for details.

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

⚑ KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
  Title 38. Veterans' Benefits (Refs & Annos)
    Part III. Readjustment and Related Benefits (Refs & Annos)
      Chapter 33. Post-9/11 Educational Assistance
        Subchapter II. Educational Assistance

38 U.S.C.A. § 3311

§ 3311. Educational assistance for service in the Armed Forces commencing on or after September 11, 2001: entitlement

Currentness

**(a) Entitlement.**--Subject to subsections (d) and (e), each individual described in subsection (b) is entitled to educational assistance under this chapter.

**(b) Covered individuals.**--An individual described in this subsection is any individual as follows:

**(1)** An individual who--

**(A)** commencing on or after September 11, 2001, serves an aggregate of at least 36 months on active duty in the Armed Forces (including service on active duty in entry level and skill training); and

**(B)** after completion of service described in subparagraph (A)--

**(i)** continues on active duty; or

**(ii)** is discharged or released from active duty as described in subsection (c).

**(2)** An individual who--

**(A)** commencing on or after September 11, 2001, serves at least 30 continuous days on active duty in the Armed Forces; and

**(B)** after completion of service described in subparagraph (A), is discharged or released from active duty in the Armed Forces for a service-connected disability.

**(3)** An individual who--

**(A)** commencing on or after September 11, 2001, serves an aggregate of at least 30 months, but less than 36 months, on active duty in the Armed Forces (including service on active duty in entry level and skill training); and

**(B)** after completion of service described in subparagraph (A)--

    **(i)** continues on active duty for an aggregate of less than 36 months; or

    **(ii)** before completion of service on active duty of an aggregate of 36 months, is discharged or released from active duty as described in subsection (c).

**(4)** An individual who--

**(A)** commencing on or after September 11, 2001, serves an aggregate of at least 24 months, but less than 30 months, on active duty in the Armed Forces (including service on active duty in entry level and skill training); and

**(B)** after completion of service described in subparagraph (A)--

    **(i)** continues on active duty for an aggregate of less than 30 months; or

    **(ii)** before completion of service on active duty of an aggregate of 30 months, is discharged or released from active duty as described in subsection (c).

**(5)** An individual who--

**(A)** commencing on or after September 11, 2001, serves an aggregate of at least 18 months, but less than 24 months, on active duty in the Armed Forces (excluding service on active duty in entry level and skill training); and

**(B)** after completion of service described in subparagraph (A)--

    **(i)** continues on active duty for an aggregate of less than 24 months; or

    **(ii)** before completion of service on active duty of an aggregate of 24 months, is discharged or released from active duty as described in subsection (c).

**(6)** An individual who--

**(A)** commencing on or after September 11, 2001, serves an aggregate of at least 6 months, but less than 18 months, on active duty in the Armed Forces (excluding service on active duty in entry level and skill training); and

**(B)** after completion of service described in subparagraph (A)--

**(i)** continues on active duty for an aggregate of less than 18 months; or

**(ii)** before completion of service on active duty of an aggregate of 18 months, is discharged or released from active duty as described in subsection (c).

**(7)** An individual who--

**(A)** commencing on or after September 11, 2001, serves an aggregate of at least 90 days, but less than 6 months, on active duty in the Armed Forces (excluding service on active duty in entry level and skill training); and

**(B)** after completion of service described in subparagraph (A)--

**(i)** continues on active duty for an aggregate of less than 6 months; or

**(ii)** before completion of service on active duty of an aggregate of 6 months, is discharged or released from active duty as described in subsection (c).

**(8)** An individual who is the child or spouse of a person who, on or after September 11, 2001, dies in line of duty while serving on active duty as a member of the Armed Forces.

**(9)** An individual who is the child or spouse of a person who, on or after September 11, 2001, dies in line of duty while serving on duty other than active duty as a member of the Armed Forces.

**(10)** An individual who is the child or spouse of a member of the Selected Reserve who dies on or after September 11, 2001, while a member of the Selected Reserve from a service-connected disability.

**(11)** An individual who is awarded the Purple Heart for service in the Armed Forces occurring on or after September 11, 2001, and continues to serve on active duty in the Armed Forces or is discharged or released from active duty as described in subsection (c).

**(c) Covered discharges and releases.**--A discharge or release from active duty of an individual described in this subsection is a discharge or release as follows:

**(1)** A discharge from active duty in the Armed Forces with an honorable discharge.

**(2)** A release after service on active duty in the Armed Forces characterized by the Secretary concerned as honorable service and placement on the retired list, transfer to the Fleet Reserve or Fleet Marine Corps Reserve, or placement on the temporary disability retired list.

**(3)** A release from active duty in the Armed Forces for further service in a reserve component of the Armed Forces after service on active duty characterized by the Secretary concerned as honorable service.

**(4)** A discharge or release from active duty in the Armed Forces after service on active duty in the Armed Forces characterized by the Secretary concerned as honorable service for--

**(A)** a medical condition which preexisted the service of the individual as described in the applicable paragraph of subsection (b) and which the Secretary determines is not service-connected;

**(B)** hardship; or

**(C)** a physical or mental condition that was not characterized as a disability and did not result from the individual's own willful misconduct but did interfere with the individual's performance of duty, as determined by the Secretary concerned in accordance with regulations prescribed by the Secretary of Defense.

**(d) Prohibition on treatment of certain service as period of active duty.**--The following periods of service shall not be considered a part of the period of active duty on which an individual's entitlement to educational assistance under this chapter is based:

**(1)** A period of service on active duty of an officer pursuant to an agreement under section 2107(b) of title 10.

**(2)** A period of service on active duty of an officer pursuant to an agreement under section 7448, 8459, or 9448 of title 10 or section 182 of title 14.

**(3)** A period of service that is terminated because of a defective enlistment and induction based on--

**(A)** the individual's being a minor for purposes of service in the Armed Forces;

**(B)** an erroneous enlistment or induction; or

**(C)** a defective enlistment agreement.

**(e) Treatment of individuals entitled under multiple provisions.**--In the event an individual entitled to educational assistance under this chapter is entitled by reason of both paragraphs (4) and (5) of subsection (b), the individual shall be treated as being entitled to educational assistance under this chapter by reason of paragraph (5) of subsection (b).

**(f) Marine Gunnery Sergeant John David Fry Scholarship.--**

**(1) In general.**--Educational assistance payable by reason of paragraphs (8), (9), and (10) of subsection (b) shall be known as the "Marine Gunnery Sergeant John David Fry scholarship".

**(2) Limitation.**--The entitlement of an individual to assistance under subsection (a) pursuant to paragraphs (8), (9), and (10) of subsection (b) because the individual was a spouse of a person described in such paragraph shall expire on the earlier of--

**(A)** the date that is 15 years after the date on which the person died; or

**(B)** the date on which the individual remarries.

**(3) Election on receipt of certain benefits.**--Except as provided in paragraph (4), a surviving spouse entitled to assistance under subsection (a) pursuant to paragraphs (8), (9), and (10) of subsection (b) who is also entitled to educational assistance under chapter 35 of this title may not receive assistance under both this section and such chapter, but shall make an irrevocable election (in such form and manner as the Secretary may prescribe) under which section or chapter to receive educational assistance.

**(4) Exception for certain elections.**--

**(A) In general.**--An election made under paragraph (3) by a spouse described in subparagraph (B) may not be treated as irrevocable if such election occurred before the date of the enactment of this paragraph.

**(B) Eligible surviving spouse.**--A spouse described in this subparagraph is an individual--

**(i)** who is entitled to assistance under subsection (a) pursuant to paragraphs (8), (9), and (10) of subsection (b); and

**(ii)** who was the spouse of a member of the Armed Forces who died during the period beginning on September 11, 2001, and ending on December 31, 2005.

**(5) Definition of child.**--For purposes of paragraphs (8), (9), and (10) of subsection (b), the term "child" includes a married individual or an individual who is above the age of twenty-three years.

### CREDIT(S)

(Added Pub.L. 110-252, Title V, § 5003(a)(1), June 30, 2008, 122 Stat. 2359; amended Pub.L. 111-32, Title X, § 1002(a), June 24, 2009, 123 Stat. 1889; Pub.L. 111-377, Title I, § 101(b), (c), Jan. 4, 2011, 124 Stat. 4107; Pub.L. 113-146, Title VII, § 701(a), (b), Aug. 7, 2014, 128 Stat. 1795; Pub.L. 114-315, Title IV, § 401(b), (c), Dec. 16, 2016, 130 Stat. 1553; Pub.L. 115-48,

Title I, §§ 102(a), 105(a), (c)(1), Aug. 16, 2017, 131 Stat. 975; Pub.L. 115-232, Div. A, Title VIII, § 809(n)(3), Aug. 13, 2018, 132 Stat. 1844; Pub.L. 116-315, Title I, § 1002(a), (b)(1), Jan. 5, 2021, 134 Stat. 4938.)

38 U.S.C.A. § 3311, 38 USCA § 3311
Current through P.L. 117-139. Some statute sections may be more current, see credits for details.

---

**End of Document**
© 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

<table>
<tr><td>

United States Code Annotated
  Title 38. Veterans' Benefits (Refs & Annos)
    Part III. Readjustment and Related Benefits (Refs & Annos)
      Chapter 33. Post-9/11 Educational Assistance
        Subchapter II. Educational Assistance

</td></tr>
</table>

38 U.S.C.A. § 3312

§ 3312. Educational assistance: duration

Effective: August 1, 2009
Currentness

**(a) In general.**--Subject to section 3695 and except as provided in subsections (b) and (c), an individual entitled to educational assistance under this chapter is entitled to a number of months of educational assistance under section 3313 equal to 36 months.

**(b) Continuing receipt.**--The receipt of educational assistance under section 3313 by an individual entitled to educational assistance under this chapter is subject to the provisions of section 3321(b)(2).

**(c) Discontinuation of education for active duty.**--

  **(1) In general.**--Any payment of educational assistance described in paragraph (2) shall not--

    **(A)** be charged against any entitlement to educational assistance of the individual concerned under this chapter; or

    **(B)** be counted against the aggregate period for which section 3695 limits the individual's receipt of educational assistance under this chapter.

  **(2) Description of payment of educational assistance.**--Subject to paragraph (3), the payment of educational assistance described in this paragraph is the payment of such assistance to an individual for pursuit of a course or courses under this chapter if the Secretary finds that the individual--

    **(A)(i)** in the case of an individual not serving on active duty, had to discontinue such course pursuit as a result of being called or ordered to serve on active duty under section 688, 12301(a), 12301(d), 12301(g), 12302, or 12304 of title 10; or

    **(ii)** in the case of an individual serving on active duty, had to discontinue such course pursuit as a result of being ordered to a new duty location or assignment or to perform an increased amount of work; and

    **(B)** failed to receive credit or lost training time toward completion of the individual's approved education, professional, or vocational objective as a result of having to discontinue, as described in subparagraph (A), the individual's course pursuit.

---

**(3) Period for which payment not charged.**--The period for which, by reason of this subsection, educational assistance is not charged against entitlement or counted toward the applicable aggregate period under section 3695 of this title shall not exceed the portion of the period of enrollment in the course or courses from which the individual failed to receive credit or with respect to which the individual lost training time, as determined under paragraph (2)(B).

## CREDIT(S)

(Added Pub.L. 110-252, Title V, § 5003(a)(1), June 30, 2008, 122 Stat. 2362.)

Notes of Decisions (1)

38 U.S.C.A. § 3312, 38 USCA § 3312
Current through P.L. 117-139. Some statute sections may be more current, see credits for details.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.    2

United States Code Annotated
  Title 38. Veterans' Benefits (Refs & Annos)
    Part III. Readjustment and Related Benefits (Refs & Annos)
      Chapter 33. Post-9/11 Educational Assistance
        Subchapter III. Administrative Provisions

38 U.S.C.A. § 3322

§ 3322. Bar to duplication of educational assistance benefits

Currentness

**(a) In general.**--An individual entitled to educational assistance under this chapter who is also eligible for educational assistance under chapter 30, 31, 32, or 35 of this title, chapter 107, 1606, or 1607 or section 510 of title 10, or the provisions of the Hostage Relief Act of 1980 (Public Law 96-449; 5 U.S.C. 5561 note) may not receive assistance under two or more such programs concurrently, but shall elect (in such form and manner as the Secretary may prescribe) under which chapter or provisions to receive educational assistance.

**(b) Inapplicability of service treated under educational loan repayment programs.**--A period of service counted for purposes of repayment of an education loan under chapter 109 of title 10 may not be counted as a period of service for entitlement to educational assistance under this chapter.

**(c) Service in Selected Reserve.**--An individual who serves in the Selected Reserve may receive credit for such service under only one of this chapter, chapter 30 of this title, and chapters 1606 and 1607 of title 10, and shall elect (in such form and manner as the Secretary may prescribe) under which chapter such service is to be credited.

**(d) Additional coordination matters.**--In the case of an individual entitled to educational assistance under chapter 30, 31, 32, or 35 of this title, chapter 107, 1606, or 1607 of title 10, or the provisions of the Hostage Relief Act of 1980, or making contributions toward entitlement to educational assistance under chapter 30 of this title, as of August 1, 2009, coordination of entitlement to educational assistance under this chapter, on the one hand, and such chapters or provisions, on the other, shall be governed by the provisions of section 5003(c) of the Post-9/11 Veterans Educational Assistance Act of 2008.

**(e) Bar to concurrent receipt of transferred education benefits and Marine Gunnery Sergeant John David Fry Scholarship Assistance.**--An individual entitled to educational assistance under both section 3319 and paragraph (8), (9), or (10) of section 3311 of this title may not receive assistance under both provisions concurrently, but shall elect (in such form and manner as the Secretary may prescribe) under which provision to receive educational assistance.

**(f) Bar to receipt of compensation and pension and Marine Gunnery Sergeant John David Fry Scholarship Assistance.**--The commencement of a program of education under paragraph (8), (9), or (10) of section 3311 of this title shall be a bar to the following:

**(1)** Subsequent payments of dependency and indemnity compensation or pension based on the death of a parent to an eligible person over the age of 18 years by reason of pursuing a course in an educational institution.

**(2)** Increased rates, or additional amounts, of compensation, dependency and indemnity compensation, or pension because of such a person, whether eligibility is based upon the death of the parent.

**(g) Bar to concurrent receipt of transferred education benefits.**--A spouse or child who is entitled to educational assistance under this chapter based on a transfer of entitlement from more than one individual under section 3319 may not receive assistance based on transfers from more than one such individual concurrently, but shall elect (in such form and manner as the Secretary may prescribe) under which source to utilize such assistance at any one time.

**(h) Bar to duplication of eligibility based on a single event or period of service.**--

**(1) Active-duty service.**--An individual with qualifying service in the Armed Forces that establishes eligibility on the part of such individual for educational assistance under this chapter, chapter 30 or 32 of this title, and chapter 1606 or 1607 of title 10, shall elect (in such form and manner as the Secretary may prescribe) under which authority such service is to be credited.

**(2) Eligibility for educational assistance based on parent's service.**--A child of a member of the Armed Forces who, on or after September 11, 2001, dies in the line of duty while serving on active duty, who is eligible for educational assistance under either chapter 35 or paragraph (8), (9), or (10) of section 3311 of this title based on the parent's death may not receive such assistance under both this chapter and chapter 35 of this title, but shall elect (in such form and manner as the Secretary may prescribe) under which chapter to receive such assistance.

## CREDIT(S)

(Added Pub.L. 110-252, Title V, § 5003(a)(1), June 30, 2008, 122 Stat. 2373; amended Pub.L. 111-377, Title I, § 111(a) to (d), Title II, § 202(a), Jan. 4, 2011, 124 Stat. 4120, 4124; Pub.L. 115-48, Title I, § 105(c)(6), Aug. 16, 2017, 131 Stat. 976; Pub.L. 116-315, Title I, § 1002(b)(5), Jan. 5, 2021, 134 Stat. 4938.)

Notes of Decisions (5)

38 U.S.C.A. § 3322, 38 USCA § 3322
Current through P.L. 117-139. Some statute sections may be more current, see credits for details.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

⚑ KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
    Title 38. Veterans' Benefits (Refs & Annos)
        Part III. Readjustment and Related Benefits (Refs & Annos)
            Chapter 33. Post-9/11 Educational Assistance
                Subchapter III. Administrative Provisions

38 U.S.C.A. § 3327

§ 3327. Election to receive educational assistance

Effective: December 16, 2016

Currentness

**(a) Individuals eligible to elect participation in post-9/11 educational assistance.**--An individual may elect to receive educational assistance under this chapter if such individual--

**(1)** as of August 1, 2009--

**(A)** is entitled to basic educational assistance under chapter 30 of this title and has used, but retains unused, entitlement under that chapter;

**(B)** is entitled to educational assistance under chapter 107, 1606, or 1607 of title 10 and has used, but retains unused, entitlement under the applicable chapter;

**(C)** is entitled to basic educational assistance under chapter 30 of this title but has not used any entitlement under that chapter;

**(D)** is entitled to educational assistance under chapter 107, 1606, or 1607 of title 10 but has not used any entitlement under such chapter;

**(E)** is a member of the Armed Forces who is eligible for receipt of basic educational assistance under chapter 30 of this title and is making contributions toward such assistance under section 3011(b) or 3012(c) of this title; or

**(F)** is a member of the Armed Forces who is not entitled to basic educational assistance under chapter 30 of this title by reason of an election under section 3011(c)(1) or 3012(d)(1) of this title; and

**(2)** as of the date of the individual's election under this paragraph, meets the requirements for entitlement to educational assistance under this chapter.

**(b) Cessation of contributions toward GI bill.**--Effective as of the first month beginning on or after the date of an election under subsection (a) of an individual described by paragraph (1)(E) of that subsection, the obligation of the individual to make contributions under section 3011(b) or 3012(c) of this title, as applicable, shall cease, and the requirements of such section shall be deemed to be no longer applicable to the individual.

**(c) Revocation of remaining transferred entitlement.**--

**(1) Election to revoke.**--If, on the date an individual described in paragraph (1)(A) or (1)(C) of subsection (a) makes an election under that subsection, a transfer of the entitlement of the individual to basic educational assistance under section 3020 of this title is in effect and a number of months of the entitlement so transferred remain unutilized, the individual may elect to revoke all or a portion of the entitlement so transferred that remains unutilized.

**(2) Availability of revoked entitlement.**--Any entitlement revoked by an individual under this subsection shall no longer be available to the dependent to whom transferred, but shall be available to the individual instead for educational assistance under chapter 33 of this title in accordance with the provisions of this section.

**(3) Availability of unrevoked entitlement.**--Any entitlement described in paragraph (1) that is not revoked by an individual in accordance with that paragraph shall remain available to the dependent or dependents concerned in accordance with the current transfer of such entitlement under section 3020 of this title.

**(d) Post-9/11 educational assistance.**--

**(1) In general.**--Subject to paragraph (2) and except as provided in subsection (e), an individual making an election under subsection (a) shall be entitled to educational assistance under this chapter in accordance with the provisions of this chapter, instead of basic educational assistance under chapter 30 of this title, or educational assistance under chapter 107, 1606, or 1607 of title 10, as applicable.

**(2) Limitation on entitlement for certain individuals.**--In the case of an individual making an election under subsection (a) who is described by paragraph (1)(A) of that subsection, the number of months of entitlement of the individual to educational assistance under this chapter shall be the number of months equal to--

**(A)** the number of months of unused entitlement of the individual under chapter 30 of this title, as of the date of the election, plus

**(B)** the number of months, if any, of entitlement revoked by the individual under subsection (c)(1).

**(e) Continuing entitlement to educational assistance not available under post-9/11 educational assistance program.**--

**(1) In general.**--In the event educational assistance to which an individual making an election under subsection (a) would be entitled under chapter 30 of this title, or chapter 107, 1606, or 1607 of title 10, as applicable, is not authorized to be available

to the individual under the provisions of this chapter, the individual shall remain entitled to such educational assistance in accordance with the provisions of the applicable chapter.

**(2) Charge for use of entitlement.**--The utilization by an individual of entitlement under paragraph (1) shall be chargeable against the entitlement of the individual to educational assistance under this chapter at the rate of 1 month of entitlement under this chapter for each month of entitlement utilized by the individual under paragraph (1) (as determined as if such entitlement were utilized under the provisions of chapter 30 of this title, or chapter 107, 1606, or 1607 of title 10, as applicable).

**(f) Additional post-9/11 assistance for members having made contributions toward GI bill.**--

**(1) Additional assistance.**--In the case of an individual making an election under subsection (a) who is described by subparagraph (A), (C), or (E) of paragraph (1) of that subsection, the amount of educational assistance payable to the individual under this chapter as a monthly stipend payable under paragraph (1)(B) of section 3313(c) of this title, or under paragraphs (2) through (7) of that section (as applicable), shall be the amount otherwise payable as a monthly stipend under the applicable paragraph increased by the amount equal to--

**(A)** the total amount of contributions toward basic educational assistance made by the individual under section 3011(b) or 3012(c) of this title, as of the date of the election, multiplied by

**(B)** the fraction--

**(i)** the numerator of which is--

**(I)** the number of months of entitlement to basic educational assistance under chapter 30 of this title remaining to the individual at the time of the election; plus

**(II)** the number of months, if any, of entitlement under chapter 30 of this title revoked by the individual under subsection (c)(1); and

**(ii)** the denominator of which is 36 months.

**(2) Months of remaining entitlement for certain individuals.**--In the case of an individual covered by paragraph (1) who is described by subsection (a)(1)(E), the number of months of entitlement to basic educational assistance remaining to the individual for purposes of paragraph (1)(B)(i)(II) shall be 36 months.

**(3) Timing of payment.**--The amount payable with respect to an individual under paragraph (1) shall be paid to the individual together with the last payment of the monthly stipend payable to the individual under paragraph (1)(B) of section 3313(c) of this title, or under paragraphs (2) through (7) of that section (as applicable), before the exhaustion of the individual's entitlement to educational assistance under this chapter.

**(g) Continuing entitlement to additional assistance for critical skills or specialty and additional service.**--An individual making an election under subsection (a)(1) who, at the time of the election, is entitled to increased educational assistance under section 3015(d) of this title, or section 16131(i) of title 10, or supplemental educational assistance under subchapter III of chapter 30 of this title, shall remain entitled to such increased educational assistance or supplemental educational assistance in the utilization of entitlement to educational assistance under this chapter, in an amount equal to the quarter, semester, or term, as applicable, equivalent of the monthly amount of such increased educational assistance or supplemental educational assistance payable with respect to the individual at the time of the election.

**(h) Alternative election by Secretary.**--

**(1) In general.**--In the case of an individual who, on or after January 1, 2017, submits to the Secretary an election under this section that the Secretary determines is clearly against the interests of the individual, or who fails to make an election under this section, the Secretary may make an alternative election on behalf of the individual that the Secretary determines is in the best interests of the individual.

**(2) Notice.**--If the Secretary makes an election on behalf of an individual under this subsection, the Secretary shall notify the individual by not later than seven days after making such election and shall provide the individual with a 30-day period, beginning on the date of the individual's receipt of such notice, during which the individual may modify or revoke the election made by the Secretary on the individual's behalf. The Secretary shall include, as part of such notice, a clear statement of why the alternative election made by the Secretary is in the best interests of the individual as compared to the election submitted by the individual. The Secretary shall provide the notice required under this paragraph by electronic means whenever possible.

**(i) Irrevocability of elections.**--An election under subsection (a) or (c)(1) is irrevocable.

**CREDIT(S)**

(Added Pub.L. 114-315, Title IV, § 405(a), Dec. 16, 2016, 130 Stat. 1555.)

Notes of Decisions (1)

38 U.S.C.A. § 3327, 38 USCA § 3327
Current through P.L. 117-139. Some statute sections may be more current, see credits for details.

**End of Document**                                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 38. Veterans' Benefits (Refs & Annos)
    Part III. Readjustment and Related Benefits (Refs & Annos)
      Chapter 36. Administration of Educational Benefits (Refs & Annos)
        Subchapter II. Miscellaneous Provisions (Refs & Annos)

38 U.S.C.A. § 3695

§ 3695. Limitation on period of assistance under two or more programs

Effective: October 1, 2013

Currentness

**(a)** The aggregate period for which any person may receive assistance under two or more of the provisions of law listed below may not exceed 48 months (or the part-time equivalent thereof):

**(1)** Parts VII or VIII, Veterans Regulation numbered 1(a), as amended.

**(2)** Title II of the Veterans' Readjustment Assistance Act of 1952.

**(3)** The War Orphans' Educational Assistance Act of 1956.

**(4)** Chapters 30, 32, 33, 34, and 36.

**(5)** Chapters 107, 1606, 1607, and 1611 of title 10.

**(6)** Section 903 of the Department of Defense Authorization Act, 1981 (Public Law 96-342, 10 U.S.C. 2141 note).

**(7)** The Hostage Relief Act of 1980 (Public Law 96-449, 5 U.S.C. 5561 note).

**(8)** The Omnibus Diplomatic Security and Antiterrorism Act of 1986 (Public Law 99-399).

**(b)** No person may receive assistance under chapter 31 of this title in combination with assistance under any of the provisions of law cited in subsection (a) of this section in excess of 48 months (or the part-time equivalent thereof) unless the Secretary determines that additional months of benefits under chapter 31 of this title are necessary to accomplish the purposes of a rehabilitation program (as defined in section 3101(5) of this title) in the individual case.

**(c)** The aggregate period for which any person may receive assistance under chapter 35 of this title, on the one hand, and any of the provisions of law referred to in subsection (a), on the other hand, may not exceed 81 months (or the part-time equivalent thereof).

## CREDIT(S)

(Added Pub.L. 90-631, § 1(d)(1), Oct. 23, 1968, 82 Stat. 1331, § 1791; renumbered § 1795 and amended Pub.L. 92-540, Title III, § 316(2), Title IV, § 403(13), Oct. 24, 1972, 86 Stat. 1086, 1090; Pub.L. 96-466, Title I, § 103, Oct. 17, 1980, 94 Stat. 2187; Pub.L. 98-223, Title II, § 203(c)(2), Mar. 2, 1984, 98 Stat. 41; Pub.L. 98-525, Title VII, § 703(d), Oct. 19, 1984, 98 Stat. 2564; Pub.L. 101-237, Title IV, § 423(a)(8)(B), (b)(1)(A), Dec. 18, 1989, 103 Stat. 2092; renumbered § 3695 and amended Pub.L. 102-83, § 5(a), (c)(1), Aug. 6, 1991, 105 Stat. 406; Pub.L. 106-65, Div. A, Title V, § 551(b), Oct. 5, 1999, 113 Stat. 614; Pub.L. 107-103, Title V, § 509(d), Dec. 27, 2001, 115 Stat. 997; Pub.L. 107-107, Div. A, Title X, § 1048(i)(8), Dec. 28, 2001, 115 Stat. 1229; Pub.L. 108-375, Div. A, Title V, § 527(b)(2), Oct. 28, 2004, 118 Stat. 1894; Pub.L. 110-252, Title V, § 5003(b)(1)(B), June 30, 2008, 122 Stat. 2375; Pub.L. 112-154, Title IV, § 401(a), Aug. 6, 2012, 126 Stat. 1188.)

Notes of Decisions (5)

38 U.S.C.A. § 3695, 38 USCA § 3695
Current through P.L. 117-139. Some statute sections may be more current, see credits for details.

    © 2022 Thomson Reuters. No claim to original U.S. Government Works.